FILED

2015 DEC -1  PM 4:45

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2015 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>TU CHAU LU,<br>     aka "William Lu,"<br>     aka "Bill Lu,"<br>     aka "Bill,"<br>     aka "Uncle Bill,"<br>TSUNG WEN HUNG,<br>     aka "Peter Hung,"<br>     aka "Peter,"<br>EDWARD KIM,<br>     aka "Eddie,"<br>JOHN EDMUNDSON,<br>PABLO HERNANDEZ,<br>EMILIO HERRERA,<br>MINA CHAU,<br>BEN HO,<br>TOM HUYNH,<br>     aka "The Fat Guy,"<br>RENALDO NEGELE,<br>JACK NGUYEN,<br>LUIS KRUEGER,<br>LI JESSICA WEI,<br>     aka "Wei Jessica Li,"<br>     aka "Ji Li Wei,"<br>     aka "Wei Ji Li,"<br>     aka "Jenny,"<br>DU TRUONG NGUYEN,<br>     aka "Andrew," | CR No. 15-**CR15- 0662**<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1962(d): Racketeer Influenced and Corrupt Organizations Conspiracy; 18 U.S.C. § 1956(h): Conspiracy to Launder Monetary Instruments; 18 U.S.C. §§ 1956(a)(1)(B), (a)(3)(B), (a)(3)(C): Laundering of Monetary Instruments; 18 U.S.C. § 2(a): Aiding and Abetting; 18 U.S.C. § 2(b): Causing an Act to be Done; 18 U.S.C. § 1512(b)(2)(B): Evidence Tampering; 31 U.S.C. § 5324(a)(2), (d)(2): Structuring Transactions to Evade a Reporting Requirement; 18 U.S.C. §§ 1963, 982(a)(1), 31 U.S.C. § 5317(c)(1): Criminal Forfeiture] |

RICHARD CHEUNG,
     aka "Richard Cheang," and
LIEN TRAN,

          Defendants.

The Grand Jury charges:

GENERAL ALLEGATIONS

At all times material to this Indictment, the following definitions and allegations apply:

1.   The abbreviation "CS1" refers to a human source operating under the direction and control of the Federal Bureau of Investigation ("FBI"), who held himself out as an agent of a criminal enterprise that engaged in drug and arms trafficking, that was in fact an undercover operation of the FBI.  CS1 further held himself out as someone who needed to conduct, and who himself could conduct, money laundering transactions.

2.   The abbreviation "CS2" refers to a human source operating under the direction and control of the FBI, who held himself out as an individual willing to assist defendant PABLO HERNANDEZ with the movement of drugs and money.

3.   The abbreviation "UC1" refers to a task force officer operating undercover under the direction and control of the FBI, who held himself out as being the boss of CS1 and a manager in the criminal enterprise described in paragraph 1 of the General Allegations.

4.   The abbreviation "UC2" refers to an FBI special agent who held himself out as being the boss of CS1 and as a middle manager in the criminal enterprise described in paragraph 1.

5.   A "foundation" is a legal entity.

2

6.     Saigon National Bank was a publicly held bank traded on the Over-the-Counter ("OTC") Market.  Saigon National Bank was headquartered in Westminster, California, and provided services at that location.  Its deposits were insured by the Federal Deposit Insurance Corporation (hereinafter "FDIC").  It received $1,549,000 in funds from the Troubled Asset Relief Program on December 23, 2008, and has not repaid any of those funds.  Saigon National Bank was a "domestic financial institution" as defined by Title 31, United States Code, Section 5312(a)(2).

7.     The Office of the Comptroller of the Currency (hereinafter "OCC") was an agency within the U.S. Department of the Treasury authorized to regulate national banks and served as the primary federal banking regulator of Saigon National Bank.

8.     The Bank Secrecy Act (hereinafter "BSA"), codified at Title 31, United States Code, Sections 5313-5326, was a set of laws enacted by Congress and regulations promulgated by the Department of Treasury to address an increase in criminal money laundering through financial institutions.  In order to prevent financial institutions from being used as intermediaries for the transfer or deposit of money derived from criminal activity such as narcotics trafficking, organized crime, terrorist financing, and other financial crimes, the BSA and regulations issued under the BSA required financial institutions to do the following:

a.     File Currency Transaction Reports ("CTRs") with the United States Department of the Treasury for every transaction conducted by and through such financial institution involving more than $10,000 in currency, including any deposit, withdrawal, transfer, or exchange of such currency, as required by Title 31,

1  United States Code, Section 5313(a), and Title 31, Code of Federal
2  Regulations, Sections 1010.310-314.
3      9.   The Financial Crimes Enforcement Network (hereinafter
4  "FinCEN") was a bureau of the Department of the Treasury assigned
5  responsibility under the BSA for receiving reports from financial
6  institutions, including CTRs.
7      10.  The BSA and the regulations created under the BSA required
8  that a financial institution file CTRs with FinCEN within 15 days of
9  the date of the transaction, under Title 31, Code of Federal
10 Regulations, Section 1010.306.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COUNT ONE

[18 U.S.C. § 1962(d)]

1.    Paragraphs 1 through 10 of the General Allegations are re-alleged and incorporated by reference as if fully set forth herein.

A.    THE RACKETEERING ENTERPRISE

2.    At various times relevant to this Indictment, defendants TU CHAU LU ("LU"), also known as ("aka") "William Lu," aka "Bill Lu," aka "Bill," aka "Uncle Bill," TSUNG WEN HUNG, aka "Peter Hung," aka "Peter" ("HUNG"), EDWARD KIM, aka "Eddie" ("KIM"), JOHN EDMUNDSON ("EDMUNDSON"), PABLO HERNANDEZ ("HERNANDEZ"), and EMILIO HERRERA ("HERRERA"), and others known and unknown to the Grand Jury, were members and associates of a criminal organization whose members and associates engaged in criminal activities, including, but not limited to, narcotics trafficking, money laundering, and international money laundering, and which operated in the Central District of California and elsewhere in the United States, and in the countries of China, Cambodia, Liechtenstein, Mexico, and Switzerland.

3.    The above referenced criminal organization, including its leadership, membership, and associates, constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4) (hereinafter referred to as the "Enterprise"), that is, a group of individuals associated in fact.  The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise. The Enterprise was bound together by loose and informal personal relationships, by a set of versatile, flexible, and diverse techniques for moving and concealing money, and by the common purposes of promoting and enhancing the positions and activities of

1  the members and associates of the Enterprise and of earning income
2  through money laundering.  The Enterprise was engaged in, and its
3  activities affected, interstate and foreign commerce.
4  B.    THE PURPOSES OF THE ENTERPRISE
5        4.    The purposes of the Enterprise included at least the
6  following:
7              a.    Enriching the members and associates of the Enterprise
8  through money laundering and other crimes involving financial
9  transactions;
10             b.    Strengthening the relationship between members and
11  associates of the Enterprise such that money laundering transactions
12  would be repeated and would increase in amounts over time;
13             c.    Expanding the reach of the Enterprise to provide money
14  laundering services to new members and associates such that the
15  number of individuals and groups participating in the Enterprise
16  through money laundering transactions would increase;
17             d.    Expanding the diversity of routes by which money could
18  be moved, concealed, and laundered, including through purchases of a
19  bank that could be used by the Enterprise to launder money;
20             e.    Strengthening and expanding the relationship between
21  the members and associates of the Enterprise and what the members and
22  associates of the Enterprise believed to be a separate criminal
23  organization that was engaged in drug trafficking, illegal arms sales
24  and smuggling, and money laundering, but which was in fact an
25  undercover operation being conducted by the FBI;
26             f.    Concealing from financial and governmental authorities
27  the nature, location, source, ownership, or control of funds,
28  including proceeds that were or were believed by the members and

1    associates of the Enterprise to be the proceeds of drug trafficking,

2    illegal weapons sales, and bribery, and

3              g.   Promoting and enhancing the Enterprise and its

4    members' and associates' activities.

5    C.   THE RACKETEERING CONSPIRACY

6         5.   Beginning on a date unknown, and continuing to in or around

7    the date of this Indictment, in Los Angeles and Orange Counties,

8    within the Central District of California, and elsewhere, defendants

9    LU, HUNG, KIM, EDMUNDSON, HERNANDEZ, and HERRERA, and others known

10   and unknown to the Grand Jury, being persons employed by and

11   associated with the Enterprise described in paragraphs 2 through 4 of

12   this Count, which constituted an "enterprise" as defined in Title 18,

13   United States Code, Section 1961(4), which enterprise engaged in, and

14   the activities of which affected, interstate and foreign commerce,

15   knowingly and willfully conspired and agreed with each other and with

16   other persons known and unknown to the Grand Jury, to violate Title

17   18, United States Code, Section 1962(c), that is, to conduct and

18   participate, directly and indirectly, in the conduct of the affairs

19   of the Enterprise, the activities of which affected interstate and

20   foreign commerce, through a pattern of racketeering activity, as that

21   term is defined in Title 18, United States Code, Sections 1961(1) and

22   1961(5), consisting of multiple acts indictable under:

23             a.   Title 18, United States Code, Section 1956(a)(1)

24   (Money Laundering);

25             b.   Title 18, United States Code, Section 1956(a)(2)

26   (International Money Laundering);

27             c.   Title 18, United States Code, Section 1956(a)(3)

28   (Money Laundering Sting Provision);

1          d.    Title 18, United States Code, Section 1956(h) (Money

2    Laundering Conspiracy); and

3          e.    Title 18, United States Code, Section 1512 (Evidence

4    Tampering).

5          It was a part of the conspiracy that each defendant charged in

6    this Count herein agreed that a conspirator would commit at least two

7    acts of racketeering activity in the conduct of the affairs of the

8    Enterprise.

9    D.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE

10        ACCOMPLISHED

11        6.    The object of the conspiracy was to be accomplished, in

12   substance, as follows:

13         a.    Defendants LU, HUNG, KIM, EDMUNDSON, HERNANDEZ, and

14   HERRERA, and others known and unknown to the Grand Jury, would

15   direct, negotiate, and conduct money laundering transactions.

16         b.    Defendants LU, HUNG, KIM, EDMUNDSON, HERNANDEZ and

17   HERRERA would place other members and associates of the Enterprise in

18   contact both with each other and with the participants of the FBI

19   undercover operation, including CS1, CS2, UC1, and UC2, in an effort

20   to agree upon and carry out money laundering transactions.

21         c.    Defendants LU, HUNG, KIM, EDMUNDSON, HERNANDEZ, and

22   HERRERA, and others known and unknown to the Grand Jury, would pay

23   and/or collect fees for conducting money laundering transactions.

24         d.    Defendant LU would use his insider knowledge, position

25   as an official at Saigon National Bank, and network of connections to

26   promote and facilitate money laundering transactions involving

27   members and associates of the Enterprise.

28

1      e.    Defendants LU, HUNG, KIM, HERNANDEZ, and HERRERA would

2  each establish or engage in separate money laundering conspiracies,

3  all working with, through, or at the instigation of defendant LU, in

4  order to further money laundering transactions using particular

5  techniques and methods.  These conspiracies would include the

6  following:  the "HUNG" conspiracy, the "LU Bank Sale" conspiracy, the

7  "KIM" conspiracy, the "SwissLoans Foundation" conspiracy, the "HO"

8  conspiracy, the "CHEUNG" conspiracy, and the "HERNANDEZ-HERRERA"

9  conspiracy.

10     **The HUNG Conspiracy**

11     f.    In the fall of 2010 and winter of 2011, defendants LU,

12  HUNG, Luis Krueger ("Krueger"), Li Jessica Wei, aka "Wei Jessica Li,"

13  aka "Ji Li Wei," aka "Wei Ji Li," aka "Jenny" ("Wei"), and Du Truong

14  Nguyen, aka "Andrew" ("D. Nguyen"), would agree to engage in

15  transactions to launder money represented by CS1 as being drug money,

16  and would operate as follows:  At a bank branch location arranged by

17  defendant LU, CS1 would deliver cash to defendants Krueger and D.

18  Nguyen to be laundered in exchange for cashier's checks.  Such

19  transactions would involve the use of bank insiders at Saigon

20  National Bank and other banks to conduct and conceal the transactions

21  and the nature and source of the funds provided by CS1.  As the price

22  for conducting these transactions, defendant HUNG would accept from

23  CS1 a 10 percent cash fee.

24     **The LU Bank Sale Conspiracy**

25     g.    In the fall of 2010 through the spring of 2011,

26  defendants LU, HUNG, and KIM would suggest that CS1's associates buy

27  a controlling ownership interest in Saigon National Bank to

28  facilitate their ability to engage in money laundering transactions.

1  Defendants LU and HUNG would tell CS1 how to purchase ownership

2  shares of Saigon National Bank without obtaining regulatory

3  approvals.  In addition, as part of any purchase of Saigon National

4  Bank by CS1 and CS1's associates, defendant LU would seek to have CS1

5  enter into a Consultant Agreement with Saigon National Bank for a

6  fee, which would be shared with defendants LU and HUNG.

7       **The KIM Conspiracy**

8       h.  In 2011, defendants LU, KIM, and Mina Chau ("Chau")

9  would agree to conduct money laundering transactions in which

10 defendant KIM would accept between $350,000 and $500,000 in cash from

11 CS1 that had been represented to be drug proceeds, plus a fee, in

12 exchange for cashier's checks written to an account purportedly

13 controlled by CS1.  With the assistance of bank insiders, defendants

14 KIM and Chau would convert CS1's cash into cashier's checks.

15 Defendants LU, KIM, and Chau would accept money laundering fees for

16 engaging in these transactions.  In 2011, defendants LU, KIM, and

17 EDMUNDSON would conduct an international money laundering transaction

18 involving $100,000 using one of defendant EDMUNDSON's accounts at

19 Bank of China in Hong Kong.  Defendants LU and KIM would each accept

20 a fee from CS1 for facilitating this international transaction.

21      **The SwissLoans Foundation Conspiracy**

22      i.  In 2012 and 2013, defendants LU, Ho, Huynh, Renaldo

23 Negele ("Negele"), and Jack Nguyen ("J. Nguyen"), would agree to sell

24 CS1 and UC2 a new or existing foundation in the country of

25 Liechtenstein as a vehicle to be used for laundering money around the

26 world and for bringing funds generated through criminal activity into

27 the United States.  Defendants Ho and Huynh would provide CS1 with

28 the details of how to buy and operate such a foundation, which

10

1  included having CS1 fill out an application, providing proof of
2  funds, and paying them a fee based upon the capitalization of the
3  foundation.  Defendant Huynh would offer to help CS1 fill out the
4  application to open the foundation, and defendants LU, Huynh, and Ho
5  would meet with CS1 and UC2 and direct them not to answer questions
6  posed on the foundation application concerning the source of CS1's
7  funds.

8        j.    Defendant Ho would introduce to CS1 defendant J.
9  Nguyen as U.S. counsel for SwissLoans, a group of financial service
10 companies involved in the creation, purchase, and management of
11 foundations, and would identify defendant Negele as his boss.
12 Defendant Ho would arrange for defendant Negele to fly to the United
13 States to meet with defendants LU, Ho, and J. Nguyen and to discuss
14 with CS1 and UC2 the use of foundations to launder money, which UC2
15 had told them came from the trade of weapons for drugs in Nigeria,
16 and the sale of these drugs in Europe for cash.  Defendants LU and
17 Negele would tell CS1 that CS1 could pay for the foundation with
18 money that had not been laundered.

19       k.    Defendants Ho and Negele would accept a partially
20 completed application for a foundation from UC2.

21       l.    Defendant Ho would propose giving CS1 and UC2 $50,000
22 in an international wire from a foundation as proof of defendant
23 Negele's ability to launder money through a foundation.

24 **The HO Conspiracy**

25       m.    In 2013, defendants LU, Ho, and Huynh would conduct
26 money laundering transactions in which Ho would accept between
27 $300,000 and $350,000 in cash from CS1, represented as being drug
28 proceeds, in exchange for wiring that amount to an account

11

1   purportedly controlled by CS1, and would pay CS1 a fee for conducting
2   each such transaction.   CS1 would then pay a fee to defendant LU for
3   facilitating each such transaction.

4   **The CHEUNG Conspiracy**

5          n.   In 2013, defendants LU and Richard Cheung, aka
6   "Richard Cheang" ("Cheung") agreed to conduct money laundering
7   transactions in which defendant Cheung would accept anywhere between
8   $30,000 and $50,000 in cash per month from CS1, represented as being
9   drug proceeds, in exchange for wiring that amount to an account
10  purportedly controlled by CS1, and would pay CS1 a fee for engaging
11  in each such transaction.   Either CS1 or defendant Cheung would then
12  pay a fee to defendant LU for facilitating such transactions.

13  **The HERNANDEZ-HERRERA Conspiracy**

14         o.   Between 2011 and 2015, defendants LU, HERNANDEZ, and
15  HERRERA would agree to launder money to and from Mexico.

16         p.   Defendant LU would tell CS1 in the summer of 2011
17  about working with brokers from Mexico who were laundering $30
18  million each month in U.S. currency and depositing this cash in
19  United States banks, including $2 million in cash in Saigon National
20  Bank.   Defendant LU would discuss this scheme with defendants KIM and
21  EDMUNDSON, and would ask CS1 if CS1 could accept cash from Mexico,
22  launder the cash, and wire the laundered funds to accounts in Hong
23  Kong or in Mexico.

24         q.   Defendants HERNANDEZ and HERRERA would meet with
25  defendant LU and CS1 in August 2011 and propose bringing United
26  States currency from clients in Mexico directly to CS1 in the United
27  States and having CS1 launder this money for a fee.   Defendant
28  HERNANDEZ would tell CS1 that his clients needed to deposit and have

1    sent back to Mexico $3 to $5 million per day, that he had deposited
2    cash at Saigon National Bank, and that he needed to find a new bank.
3    As part of this conspiracy, defendant HERRERA would offer to give CS1
4    $1 million per day to transfer back to Mexico.
5              r.    Defendant HERNANDEZ would propose to CS1 in November
6    2011 a check-cashing scheme in which CS1 would accept checks from a
7    variety of sources and send the money back to defendants HERNANDEZ
8    and HERRERA's clients.
9              s.    Defendant HERNANDEZ would meet with CS1 in March 2012
10   and would, in consultation with an unindicted co-conspirator, propose
11   transactions in which CS1 would pick up $3 million monthly in cash
12   for transfer back to Mexico in exchange for a fee to be shared with
13   CS1 and defendants HERNANDEZ and HERRERA.
14             t.    Defendant HERNANDEZ would propose in April 2012 that
15   CS1 pick up cash in Phoenix, Arizona; Kansas; and elsewhere for
16   transfer to Mexico.
17             u.    Defendant HERNANDEZ would propose in May 2012 that,
18   for different clients, CS1 would move $600,000 from Mexico to Hong
19   Kong every three weeks.
20             v.    Defendants HERNANDEZ and HERRERA would meet with CS1
21   in August 2012 to propose that CS1 accept $500,000 in cash and
22   deliver the funds to Tijuana, Mexico, the same day.
23             w.    Defendant HERNANDEZ would propose in February 2014
24   that CS1 engage in money laundering transactions involving funds that
25   originated in Canada.
26             x.    Defendant HERRERA would deposit large sums of cash in
27   United States banks and transfer these funds to Mexico.
28
                                      13

y.   Defendant HERNANDEZ would control a business in Chula Vista, California, called Credes, which defendant HERRERA would suggest using as part of the transactions.

z.   Defendant HERRERA would arrange for buyers to acquire shares in Saigon National Bank, for the purpose of laundering money, and to guarantee its movement.

aa.   Defendant HERNANDEZ would propose in September 2014 obtaining merchandise on credit from a powerful Colombian drug lord.

bb.   Defendant HERNANDEZ would propose in September 2014 laundering $300 million for "Chapo's people" from Sinaloa for a three percent fee.

cc.   Defendant HERNANDEZ would attempt in April 2015 to arrange the purchase of a bank in Southern California that could be used by members of the Enterprise to launder money.

E.   OVERT ACTS

7.   In furtherance of the racketeering conspiracy, and to accomplish the object of the racketeering conspiracy, on or about the following dates, defendants LU, HUNG, KIM, EDMUNDSON, HERNANDEZ, and HERRERA, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, the following:

**The HUNG Conspiracy**

**The Laundering of $200,000 on December 6, 2010**

Overt Act No. 1:   On March 30, 2010, at the Hilton Hotel in San Gabriel, California ("Hilton Hotel"), defendant HUNG met with CS1 and discussed $100,000 and $300,000 money laundering transactions and money laundering fees.

1    Overt Act No. 2:    On March 30, 2010, at the Hilton Hotel,
2  defendant HUNG was told by CS1 that CS1's money was drug money, and
3  defendant HUNG told CS1 to say instead that the money was from
4  corruption, as a way of lowering money laundering fees.

5    Overt Act No. 3:    On March 30, 2010, at the Hilton Hotel,
6  defendant HUNG stated that in future transactions, someone would come
7  out of the bank, give CS1 a cashier's check, take the cash provided
8  by CS1 inside the bank, and, once the cash was confirmed as real,
9  would tell defendant HUNG and CS1 that they could leave.

10    Overt Act No. 4:    On April 22, 2010, at the Hilton Hotel,
11  defendant HUNG was told by CS1 that the money was drug money.

12    Overt Act No. 5:    On April 30, 2010, defendant HUNG met CS1 at
13  the Hilton Hotel and told CS1 that this is "in reality . . .
14  laundering cash."

15    Overt Act No. 6:    On April 30, 2010, defendant HUNG told CS1
16  that transactions over $30,000 would be done with defendant LU's
17  assistance, that transactions over $50,000 would be done company to
18  company, and that transactions starting at $300,000 would be done
19  overseas.

20    Overt Act No. 7:    On November 16, 2010, at the Lakeside Grill
21  restaurant in the Wynn Hotel at 3131 S. Las Vegas Boulevard, in Las
22  Vegas, Nevada, defendant HUNG told CS1 and UC1 to conduct a
23  transaction using defendant LU as the banker.

24    Overt Act No. 8:    On November 16, 2010, defendant HUNG agreed
25  with CS1 and UC1 to do a deal for $200,000 or $250,000.

26    Overt Act No. 9:    On December 2, 2010, at the Hilton Hotel,
27  defendant HUNG told CS1 that defendant LU would tell them which bank
28  to use, asked CS1 for the name that CS1 wanted the cashier's check to

15

1  be payable to, and was told by CS1 that the name to place on the

2  cashier's check was "United Business Associates," an account

3  represented by CS1 to be his own.

4      Overt Act No. 10:    On December 6, 2010, defendants HUNG, KIM,

5  and Krueger met at a Taco Bell restaurant in Westminster, California

6  (the "Taco Bell restaurant"), to discuss the $200,000 money

7  laundering transaction that would occur at Saigon National Bank.

8      Overt Act No. 11:    On December 6, 2010, defendant HUNG left the

9  Taco Bell restaurant and met CS1 in the parking lot at Saigon

10  National Bank, located at 15606 Brookhurst Street, Westminster,

11  California, where defendant HUNG entered CS1's car, accepted $20,000

12  from CS1 as his fee for laundering $200,000 in purported drug

13  proceeds, and was shown the $200,000 in cash.

14      Overt Act No. 12:    On December 6, 2010, defendant HUNG and CS1

15  walked to Saigon National Bank, where they met defendant Krueger

16  outside the bank.

17      Overt Act No. 13:    On December 6, 2010, at Saigon National

18  Bank, defendants HUNG, Krueger, and CS1 took the cash to the merchant

19  teller window, and defendant Krueger told defendant HUNG and CS1 to

20  wait in the bank lobby, where defendant KIM joined them; and

21  defendant Krueger returned with two $100,000 cashier's checks, each

22  in the amount of $100,000 made out to "United Business Associates."

23      Overt Act No. 14:    On December 10, 2010, at defendant LU's

24  office at Saigon National Bank, UC1 thanked defendant LU for

25  overseeing the $200,000 transaction, at which point defendant LU

26  gestured for UC1 and CS1 to keep quiet and told them that he did not

27  want to talk about the transaction in the bank.

28

Overt Act No. 15:   On February 10, 2011, defendants KIM and LU met CS1 at the Hilton Hotel and told CS1 that defendant HUNG did not pay either of them for their participation in the $200,000 transaction.

**The Laundering of $250,000 on January 24, 2011**

Overt Act No. 16:   On January 4, 2011, in a telephone conversation with CS1, defendant HUNG told CS1 that defendant LU wanted to stay "behind the scenes."

Overt Act No. 17:   On January 7, 2011, at a meeting at the Hilton Hotel, attended by defendants HUNG, Wei and CS1, defendant HUNG said that defendant LU faced a lot of pressure because CS1 had done a transaction in defendant LU's bank, that defendant LU had an arrangement at another bank, and that defendant LU had made an arrangement to have another cashier's check prepared.

Overt Act No. 18:   On January 7, 2011, at the Hilton Hotel, defendant Wei told CS1 that whoever would prepare the cashier's check for any money laundering transaction would be a stranger to CS1 and that the process would be the same at every bank, with CS1 bringing cash to the bank, meeting a stranger, and getting a cashier's check in return for the cash.

Overt Act No. 19:   On January 11, 2011, at the Hilton Hotel, defendants LU and HUNG met with CS1 to discuss future money laundering transactions, and defendant HUNG asked whether CS1 could conduct a money laundering transaction on January 18, 2011.

Overt Act No. 20:   On January 14, 2011, in a telephone call, defendant HUNG told CS1 to meet him at Saigon National Bank in Westminster, California, at noon on January 24, 2011.

1    Overt Act No. 21:   Sometime prior to January 24, 2011,

2    defendant LU arranged to have a $250,000 money laundering transaction

3    take place at the Bank of America branch located at the intersection

4    of Brookhurst Street and Westminster Boulevard in Westminster,

5    California (the "Westminster BofA").

6    Overt Act No. 22:   On January 24, 2011, defendant HUNG met CS1

7    in the parking lot of Saigon National Bank and accepted a $25,000 fee

8    for laundering $250,000 in purported drug proceeds provided by CS1.

9    Overt Act No. 23:   On January 24, 2011, defendant HUNG and CS1

10   drove to the Westminster BofA.

11   Overt Act No. 24:   On January 24, 2011, while in the car

12   driving to the Westminster BofA, defendant HUNG told CS1 that

13   defendant LU would make arrangements for money laundering

14   transactions to take place at a different bank with different people

15   every time.

16   Overt Act No. 25:   On January 24, 2011, defendant D. Nguyen and

17   CS1 approached a teller window, where CS1 gave $250,000 in U.S.

18   currency to the cashier, and defendant D. Nguyen obtained a cashier's

19   check in the amount of $250,000 made out to "United Business

20   Associates," which he provided to CS1.

21   Overt Act No. 26:   On January 24, 2011, while driving back to

22   Saigon National Bank from the Westminster BofA, defendant LU called

23   defendant HUNG to find out why the money laundering transaction they

24   were conducting was taking so long.

25   Overt Act No. 27:   On January 24, 2011, upon their arrival at

26   Saigon National Bank, defendant LU asked defendant HUNG and CS1

27   whether the deal had been completed.

28

**The LU Bank Sale Conspiracy**

**Overt Act No. 28:**   On December 10, 2010, at defendant LU's office at Saigon National Bank, defendants LU and HUNG met with CS1 and UC1, and UC1 was introduced to defendant LU, who suggested that UC1 buy Saigon National Bank.

**Overt Act No. 29:**   On January 11, 2011, at a meeting between defendants HUNG, LU, and CS1 in the restaurant at the Hilton Hotel, after CS1 mentioned that one of his associates was interested in purchasing a bank, defendant LU interrupted CS1 and suggested that CS1's associate buy Saigon National Bank.

**Overt Act No. 30:**   On January 11, 2011, at a meeting between defendants HUNG, LU, and CS1 in the restaurant at the Hilton Hotel, defendants LU and HUNG advised CS1 how CS1's associates could buy an ownership stake in Saigon National Bank.

**Overt Act No. 31:**   On January 11, 2011, at a meeting between defendants HUNG, LU, and CS1 in the restaurant at the Hilton Hotel, defendant LU suggested to CS1 that CS1 enter into a Consultant Agreement with Saigon National Bank in which CS1 would receive, as part of any bank sale, a fee on any deal.

**Overt Act No. 32:**   On January 11, 2011, at a meeting between defendants HUNG, LU, and CS1 in the restaurant at the Hilton Hotel, in response to CS1's contention that any consulting fee would be too little, defendant HUNG calculated how much a three percent consulting fee would be paid to CS1 based on a $5 million purchase of Saigon National Bank shares.

**Overt Act No. 33:**   On January 11, 2011, at a meeting between defendants HUNG, LU, and CS1 in the restaurant at the Hilton Hotel, defendant LU advised CS1 that if CS1 acted fast, defendant LU could

19

1  tell the Chairman of the Board of Saigon National Bank about the
2  proposal for CS1's associates to buy shares of Saigon National Bank.

3       Overt Act No. 34:   On January 11, 2011, at a meeting between
4  defendants HUNG, LU, and CS1 at the Hilton Hotel, defendant HUNG told
5  CS1 that if Saigon National Bank were sold, they would share in the
6  consultant fee generated as a result of the sale; and defendant HUNG
7  stated that they would be acting as "double agents."

8       Overt Act No. 35:   On January 11, 2011, at a meeting between
9  defendants HUNG, LU, and CS1 at the Hilton Hotel, defendant LU told
10 CS1 that a foreigner could own up to 24.99 percent of the shares of a
11 bank without the approval of regulators, and that two individuals
12 owning 24.99 percent of the shares would equal 49.98 percent
13 ownership of the bank.

14      Overt Act No. 36:   On January 11, 2011, at a meeting between
15 defendants HUNG, LU, and CS1 at the Hilton Hotel, defendant LU
16 advised CS1 to use two names and two different accounts to buy shares
17 of Saigon National Bank, to transfer the money through Hong Kong, and
18 to buy shares of Saigon National Bank at different times, all to
19 avoid having to obtain approvals relating to the purchase of the
20 bank.

21      Overt Act No. 37:   On January 11, 2011, at a meeting between
22 defendants HUNG, LU, and CS1 at the Hilton Hotel, defendant LU told
23 CS1 that he hoped that CS1's associates would buy shares of Saigon
24 National Bank so that defendant LU and his associates could control
25 the bank and then take care of things for CS1 and his associates.

26      Overt Act No. 38:   On January 11, 2011, at a meeting between
27 defendants HUNG, LU, and CS1 at the Hilton Hotel, defendants LU and

28

1    HUNG told CS1 that they would teach CS1 step-by-step how to purchase
2    shares of Saigon National Bank.

3        Overt Act No. 39:    On January 11, 2011, at a meeting between
4    defendants HUNG, LU, and CS1 at the Hilton Hotel, defendant LU, after
5    learning that CS1's associate who would buy shares of Saigon National
6    Bank was a Chinese foreigner, told CS1 how shares in the bank could
7    be purchased in incremental amounts over time to obtain a controlling
8    interest of the bank.

9        Overt Act No. 40:    On January 11, 2011, at a meeting between
10   defendants HUNG, LU, and CS1 at the Hilton Hotel, defendant LU told
11   CS1 that CS1 could not use a corporate name to buy shares of Saigon
12   National Bank because a corporation can only buy up to 4.99 percent
13   of a bank's shares.

14       Overt Act No. 41:    On January 11, 2011, at a meeting between
15   defendants HUNG, LU, and CS1 at the Hilton Hotel, defendant LU told
16   CS1 that the fastest way to obtain a controlling ownership interest
17   in a bank without obtaining the approvals necessary to purchase a
18   bank would be for CS1 to use two individuals and a company to
19   purchase the bank.

20       Overt Act No. 42:    On January 11, 2011, at a meeting between
21   defendants HUNG, LU, and CS1 at the Hilton Hotel, defendant LU told
22   CS1 that defendant LU would tell his boss that the consulting fee
23   related to the purchase of Saigon National Bank would be five percent
24   and that defendant LU would receive a one percent consulting fee upon
25   the sale of the bank.

26       Overt Act No. 43:    On January 11, 2011, at a meeting between
27   defendants HUNG, LU, and CS1 at the Hilton Hotel, defendant LU
28   advised CS1 to claim that CS1 was the CEO of a publicly traded

1 company in order to explain CS1's ability to pay millions of dollars
2 for shares of Saigon National Bank.

3    Overt Act No. 44:   On January 24, 2011, defendants LU and HUNG
4 met CS1 at a noodle restaurant at the south end of the parking lot of
5 Saigon National Bank, where defendant LU told CS1 to hurry up if he
6 wanted to buy the bank because if the Chairman of the Board of Saigon
7 National Bank accepted another offer, the opportunity for CS1's
8 associates to buy the bank would be closed.

9    Overt Act No. 45:   On January 24, 2011, defendants LU and HUNG
10 met CS1 at a noodle restaurant at the south end of the parking lot of
11 Saigon National Bank, where defendant LU told CS1 that LU had said
12 "no" to other offers to buy shares of Saigon National Bank in order
13 to provide CS1's associates with the chance to buy a controlling
14 interest in the bank.

15    Overt Act No. 46:   On January 24, 2011, defendants LU and HUNG
16 met CS1 at a noodle restaurant at the south end of the parking lot of
17 Saigon National Bank, where defendant HUNG urged CS1 to hurry up and
18 buy controlling shares of Saigon National Bank because, after that,
19 many things would become easy to do.

20    Overt Act No. 47:   On January 26, 2011, in a telephone call
21 with CS1, defendant LU was told by CS1 that they were the middlemen
22 for the purchase of Saigon National Bank, and defendant LU responded
23 that being paid a five percent consulting fee based on a $7 million
24 purchase price for the bank would earn them $350,000, which defendant
25 LU noted was not an insignificant sum of money.

26    Overt Act No. 48:   On January 26, 2011, in an email to CS1,
27 defendant LU told CS1 that the CFO of Saigon National Bank would send

28

22

1   the December 31, 2010 financial information for the bank to CS1,

2   which the CFO did two days later.

3       Overt Act No. 49:   On February 10, 2011, defendants LU and KIM

4   met CS1 at the Hilton Hotel, and defendant LU said he hoped that CS1

5   would take a 50 percent share in Saigon National Bank.

6       Overt Act No. 50:   On February 10, 2011, defendants LU and KIM

7   met CS1 at the Hilton Hotel, and defendant LU stated that he owned

8   four or five percent of Saigon National Bank, and that his share of

9   the bank, together with CS1's proposed 50 percent share of the bank,

10  would equal a 55 percent share of the bank.

11      Overt Act No. 51:   On February 10, 2011, at the Hilton Hotel,

12  defendant LU provided to CS1, to review and sign, a copy of a

13  Suitability Statement and Subscription Agreement providing for the

14  purchase of 60 million shares of common stock, representing almost

15  sixty percent ownership of Saigon National Bank, and two copies of a

16  Consulting Agreement containing CS1's name and providing for the

17  payment of a five percent consulting fee upon the sale of the bank.

18      Overt Act No. 52:   On February 10, 2011, at the Hilton Hotel,

19  defendant LU advised CS1 not to use CS1's own name to purchase shares

20  of Saigon National Bank.

21      Overt Act No. 53:   On March 9, 2011, at the Country Club

22  Steakhouse at the Wynn Casino in Las Vegas, Nevada (the "Country Club

23  Steakhouse"), defendant KIM told CS1 and UC1 that it was fortunate

24  that Saigon National Bank was small enough that they could control

25  it.

26      Overt Act No. 54:   On March 9, 2011, at the Country Club

27  Steakhouse, defendant LU told CS1 and UC1 that Saigon National Bank

28  was in a unique situation because it had one major shareholder

1  controlling more than 60 percent of the bank, and that if UC1 were to
2  go through that majority shareholder, UC1 could own 25 percent of the
3  bank without obtaining regulatory approval.  Defendant LU then told
4  UC1 that if UC1 involved two individuals in the purchase of the bank,
5  UC1 could own 50 percent of the bank without obtaining regulatory
6  approval.

7      Overt Act No. 55:   On March 9, 2011, at the Country Club
8  Steakhouse, defendants LU and KIM told UC1 that Saigon National Bank
9  would be good for people who would use the bank to move money for
10 their own purposes, and defendant LU provided CS1 with a Suitability
11 Statement and Subscription Agreement and a Private Placement
12 Memorandum providing for the purchase of Saigon National Bank.

13     Overt Act No. 56:   On March 9, 2011, at the Country Club
14 Steakhouse, defendant LU told CS1 and UC1 that to clean money CS1 and
15 UC2 should each put a million dollars in Saigon National Bank,
16 because, as shareholders, no background check would be conducted.

17     Overt Act No. 57:   On March 9, 2011, at the Country Club
18 Steakhouse, defendant LU told CS1 and UC1 it would be easy to clean
19 money by buying a bank and later selling it.

20     Overt Act No. 58:   On March 31, 2011, defendant LU met CS1 at
21 the Red Restaurant at the Pacific Palms Hotel, and defendant LU gave
22 CS1 two copies of a Consulting Agreement and two copies of a
23 Confidentiality Agreement, dated March 31, 2011, that defendant LU
24 had prepared for CS1's signature, in which CS1 was identified as a
25 consultant on the sale of Saigon National Bank and in which a
26 consulting fee was specified in the amount of five percent of the
27 bank's sale price.

28

Overt Act No. 59:   On March 31, 2011, at the Red Restaurant at the Pacific Palms Hotel, defendant LU was told by CS1 that UC1's cash was from cocaine trafficking, and defendant LU told CS1 not to tell Saigon National Bank shareholder Tran that UC1's money was from cocaine trafficking and that CS1 could tell shareholder Tran that this money came from corruption.

Overt Act No. 60:   On March 31, 2011, at the Red Restaurant at the Pacific Palms Hotel, defendant LU asked CS1 for a fee for arranging the purchase of Saigon National Bank stock from shareholder Tran.

Overt Act No. 61:   On March 31, 2011, at the Red Restaurant at the Pacific Palms Hotel, defendant LU told CS1 that CS1 would benefit from buying Saigon National Bank, because when CS1 sold it, CS1 could legitimately take cash out of the bank.

Overt Act No. 62:   On March 31, 2011, at the Red Restaurant at the Pacific Palms Hotel, defendant LU told CS1 that if CS1 put money into Saigon National Bank slowly, a million dollars at time, a background check into the source of this money would not be conducted.

Overt Act No. 63:   On March 31, 2011, defendant LU and CS1 met shareholder Tran at S.G. Superstore, located at 1635 South San Gabriel Boulevard, San Gabriel, California, in order to discuss CS1's purchase of some of shareholder Tran's shares in Saigon National Bank.

**The KIM Conspiracy**

**The Laundering of $350,000 on March 14, 2011**

Overt Act No. 64:   On February 10, 2011, at the Hilton Hotel, defendant LU re-introduced defendant KIM to CS1 to discuss future money laundering transactions.

Overt Act No. 65:   On February 10, 2011, at the Hilton Hotel, defendant KIM stated that his third primary partner, defendant EDMUNDSON, had the ability to deposit large amounts of cash.

Overt Act No. 66:   On February 10, 2011, at the Hilton Hotel, defendant KIM told CS1 that laundering money out of Hong Kong would be ideal because defendant EDMUNDSON had the capability of depositing anywhere from $10 to $20 million in cash with the Bank of China.

Overt Act No. 67:   On February 10, 2011, at the Hilton Hotel, defendants LU and KIM were told by CS1 that the money of the people CS1 represented was dirty money and was "corrupted."

Overt Act No. 68:   On February 10, 2011, defendant KIM told CS1 that they could bring money laundered through Hong Kong back to the United States.

Overt Act No. 69:   On February 10, 2011, at the Hilton Hotel, defendant LU identified his partners as defendants KIM and EDMUNDSON.

Overt Act No. 70:   On March 9, 2011, at the Pacific Palms Hotel, defendants LU and KIM met CS1 and UC1, and defendant KIM told CS1 and UC1 that he would be ready to conduct a money laundering transaction on the following Monday and asked CS1 and UC1 if they wanted to do the deal for $350,000.

Overt Act No. 71:   On March 9, 2011, at the Pacific Palms Hotel, defendant KIM agreed to receive an eight percent fee for facilitating a money laundering transaction with CS1 and UC1.

26

Overt Act No. 72:   On March 14, 2011, in the parking lot of GBC International Bank, located at 9113 Bolsa Avenue, Westminster, California ("GBC Bank"), defendant KIM got into CS1's car and accepted $28,000 in cash from CS1 as his laundering fee.

Overt Act No. 73:   On March 14, 2011, in the GBC Bank parking lot in CS1's car, defendant KIM was told by CS1 that the money to be laundered was from the sale of cocaine.

Overt Act No. 74:   On March 14, 2011, in the GBC Bank parking lot, defendant KIM and CS1 met defendant Chau and walked into GBC Bank, where defendant KIM received $350,000 in cash in a black bag from CS1.

Overt Act No. 75:   On March 14, 2011, at GBC Bank, defendants KIM and Chau complained about CS1 being late to the bank for the money laundering transaction, and defendant KIM explained that the branch manager could not wait for CS1 any longer and had to leave.

Overt Act No. 76:   On March 14, 2011, defendant KIM called and told defendant LU to come to the GBC Bank parking lot because they needed to go to the Wells Fargo Bank branch on Bolsa Avenue since their "mutual friend" at GBC Bank had already left and was unable to assist in their money laundering transaction.

Overt Act No. 77:   On March 14, 2011, defendant LU drove to the GBC Bank parking lot, where he handed a note to defendant KIM's driver.

Overt Act No. 78:   On March 14, 2011, while driving to Wells Fargo Bank, defendant KIM told CS1 that defendant Chau had a history of engaging in half million dollar cash transactions at Wells Fargo Bank because of her restaurant business.

Overt Act No. 79:   On March 14, 2011, at Wells Fargo Bank on Bolsa Avenue, after CS1 gave $350,000 to a teller at Wells Fargo Bank at defendant KIM's direction, defendant Chau told the bank teller to make a cashier's check out to "United Business Associates" in exchange for the cash.

Overt Act No. 80:   On March 14, 2011, at Wells Fargo Bank on Bolsa Avenue, defendant Chau accepted the cashier's check and receipt from the bank teller, and gave the cashier's check to CS1.

Overt Act No. 81:   On March 14, 2011, defendant Chau deposited $18,000 in cash at Wells Fargo Bank on Bolsa Avenue.

Overt Act No. 82:   On March 15, 2011, at Wells Fargo Bank, defendant Chau wired $18,000 to Etrade Bank to defendant KIM's account.

**The Laundering of $400,000 on June 20, 2011**

Overt Act No. 83:   On June 9, 2011, defendant KIM, defendant LU, and CS1 met at the Pacific Palms Hotel, where defendant KIM and CS1 agreed that the next transaction between them would take place on Monday, June 20, 2011, and defendant KIM told CS1 that this transaction would take place at two banks, one of which was a Wells Fargo Bank branch.

Overt Act No. 84:   On June 10, 2011, defendant KIM emailed CS1 the address of the Wells Fargo Bank branch located at 7950 Westminster Boulevard in Westminster, California, and wrote that a Chase Bank was right next door.

Overt Act No. 85:   On June 16, 2011, at the Pacific Palms Hotel, defendants LU and KIM met with CS1 and UC2 to discuss details of their upcoming money laundering transaction and accepted from CS1

1  a new company name, "Dean Investment," an account represented by CS1
2  to be his own, to be used for the cashier's check.

3      Overt Act No. 86:   On June 20, 2011, defendant KIM met CS1 and
4  UC2 in a parking lot shared by Wells Fargo Bank located at 7950
5  Westminster Boulevard ("Wells Fargo Bank") and Chase Bank located at
6  14011 Beach Boulevard ("Chase Bank"), in Westminster, California, got
7  into UC2's car, and accepted from CS1 $32,000 in cash as defendant
8  KIM's money laundering fee.

9      Overt Act No. 87:   On June 20, 2011, defendant Chau, an
10 unindicted co-conspirator, and CS1 went into the Chase Bank and to
11 the merchant teller window, where the teller was given $200,000 in
12 cash.

13     Overt Act No. 88:   On June 20, 2011, at Chase Bank, defendant
14 Chau facilitated the transfer of a $200,000 cashier's check payable
15 to "Dean Investment" to CS1.

16     Overt Act No. 89:   On June 20, 2011, defendant Chau and CS1
17 walked to the Wells Fargo Bank on Westminster Boulevard next door to
18 the Chase Bank, and they approached a teller window where defendant
19 Chau purchased a cashier's check payable to "Dean Investment" in
20 exchange for $200,000 in cash provided by CS1.

21 **The Laundering of $500,000 on September 20, 2011**

22     Overt Act No. 90:   On July 18, 2011, at the Pacific Palms
23 Hotel, defendants KIM, LU, and EDMUNDSON met with CS1 and UC2 to
24 discuss money laundering, and defendant KIM introduced defendant
25 EDMUNDSON to CS1 and UC2 in order to discuss the possibility of
26 conducting international money laundering transactions.

27     Overt Act No. 91:   On July 18, 2011, at the Pacific Palms
28 Hotel, defendant KIM, in front of defendants LU and EDMUNDSON, told

1   CS1 and UC2 that they all knew the money they were handling with CS1
2   was drug money.
3       Overt Act No. 92:   On July 18, 2011, at the Pacific Palms
4   Hotel, defendant EDMUNDSON explained to CS1 and UC2 that his Hong
5   Kong money laundering scheme used over-inflated invoices, consultant
6   or service fees, and fictitious part-time consultants in China,
7   Russia, and Yugoslavia, to conceal the movement or source of the
8   money laundered through the scheme.
9       Overt Act No. 93:   On August 11, 2011, at the Pacific Palms
10  Hotel, defendant LU and CS1 negotiated a 0.5 percent fee for
11  defendant LU in addition to the seven percent fee for defendant KIM
12  for the next transaction.
13      Overt Act No. 94:   On August 25, 2011, at the Seafood World
14  restaurant, located at 15351 Brookhurst Street, Suite 106, in
15  Westminster, California (the "Seafood World restaurant"), defendant
16  LU asked CS1 to pay him in cash a portion of the fee for defendant
17  KIM that CS1 would negotiate with defendant KIM the following week.
18      Overt Act No. 95:   On August 31, 2011, defendant KIM called CS1
19  and agreed upon a seven percent fee to launder $500,000.
20      Overt Act No. 96:   On September 9, 2011, at the Pacific Palms
21  Hotel, defendant KIM met with CS1 and UC2 to discuss the next money
22  laundering transaction they could engage in together.
23      Overt Act No. 97:   On September 9, 2011, at the Pacific Palms
24  Hotel, defendant KIM confirmed that his fee to launder money would be
25  seven percent, but he agreed to reduce his fee to six percent for
26  deals involving in excess of $1 million.
27      Overt Act No. 98:   On September 14, 2011, defendant KIM emailed
28  CS1, confirmed the date and time for the upcoming money laundering

1  transaction as September 20, 2011, at 11:30 a.m., and provided CS1
2  with the address of the Wells Fargo Bank where the transaction would
3  take place.

4      Overt Act No. 99:   On September 20, 2011, defendant KIM met CS1
5  in the parking lot located between the Wells Fargo Bank on
6  Westminster Boulevard and the Chase Bank on Beach Boulevard in
7  Westminster, California, got into CS1's car, and accepted $35,000 in
8  cash from CS1 as his money laundering fee.

9      Overt Act No. 100:   On September 20, 2011, defendant Chau met
10 defendant KIM and CS1 in the parking lot between the Wells Fargo Bank
11 on Westminster Boulevard and a Chase Bank, and defendants Chau, KIM,
12 and CS1 entered Chase Bank, where defendant Chau told the teller to
13 prepare a cashier's check in the amount of $250,000 in the name of
14 "Executive Real Estate," an account represented by CS1 to be his own.

15     Overt Act No. 101:   On September 20, 2011, defendant KIM,
16 defendant Chau and CS1 walked into the Wells Fargo Bank branch on
17 Westminster Boulevard next door to the Chase Bank.

18     Overt Act No. 102:   On September 20, 2011, in the Wells Fargo
19 Bank on Westminster Boulevard, CS1 handed $250,000 in cash to the
20 teller, and defendant Chau purchased a cashier's check payable to
21 "Executive Real Estate" in exchange for this cash.

22     Overt Act No. 103:   On September 21, 2011, at the Cima
23 Restaurant at the Pacific Palms Hotel, defendant LU received $2,500
24 from CS1 in the restroom as a fee for the $500,000 money laundering
25 transaction that took place the previous day.

26     **The Laundering of $100,000 on October 13, 2011**

27     Overt Act No. 104:   On September 9, 2011, at the Pacific Palms
28 Hotel, defendant KIM met CS1 and UC2 to discuss the process of

1  executing international wire transfers and suggested a test using one
2  of defendant EDMUNDSON's accounts at the Bank of China.

3      Overt Act No. 105:  On September 9, 2011, at the Pacific Palms
4  Hotel, defendant KIM said that, as payment for conducting
5  international money laundering transactions that CS1 and UC2 wished
6  to conduct, a 5.5 percent fee would be divided among him, defendant
7  EDMUNDSON, and three Hong Kong bankers.

8      Overt Act No. 106:  On September 9, 2011, at the Pacific Palms
9  Hotel, defendant KIM gave UC2 a paper containing bank account
10 information for one of defendant EDMUNDSON's Bank of China accounts
11 in Hong Kong where UC2 and CS1 were set to wire $100,000.

12     Overt Act No. 107:  On September 20, 2011, in the parking lot
13 between the Wells Fargo Bank on Westminster Boulevard and a Chase
14 Bank, in CS1's car, defendant KIM received from CS1 the bank account
15 information for "Sunshine Enterprises," an account, represented by
16 CS1 to be his own, to use for the international money laundering
17 transaction.

18     Overt Act No. 108:  On October 4, 2011, at the Starbucks at the
19 intersection of Atlantic Boulevard and Valley Boulevard, in Alhambra,
20 California (the "Alhambra Starbucks"), defendant KIM met with CS1 and
21 UC2, and defendant KIM was told by CS1 that the money for the
22 international money laundering transactions they were conducting came
23 from the sale of weapons.

24     Overt Act No. 109:  On October 6, 2011, defendant LU and CS1 met
25 at the California Fish Grill, located at 419 S. Associated Road,
26 Brea, California (the "California Fish Grill restaurant"), where
27 defendant LU was told by CS1 that the money for the international

28

money laundering transactions they were conducting involved the sale of rockets from Libya that shoot down planes.

Overt Act No. 110:   On October 6, 2011, at the California Fish Grill restaurant, defendant LU thanked CS1 for taking care of defendant LU with the payment of a money laundering fee.

Overt Act No. 111:   On October 13, 2011, defendant EDMUNDSON received $100,000, minus transaction charges, into an account he held at the Bank of China in Hong Kong.

Overt Act No. 112:   On October 14, 2011, defendant EDMUNDSON wired to the account for "Sunshine Enterprises" the sum of $100,000, minus transaction charges.

Overt Act No. 113:   On October 18, 2011, at the Alhambra Starbucks, defendant KIM received from CS1 a $5,500 fee for helping to facilitate the international money laundering transaction involving $100,000 sent through defendant EDMUNDSON's bank account at the Bank of China in Hong Kong.

Overt Act No. 114:   On October 20, 2011, at the California Fish Grill restaurant, defendant LU and CS1 went to the restroom, where LU received $1,000 from CS1, which represented one percent of the $100,000 laundered through defendant EDMUNDSON's bank account at the Bank of China in Hong Kong.

Overt Act No. 115:   On November 1, 2012, in a call between defendant EDMUNDSON and CS1, defendant EDMUNDSON acknowledged knowing prior to the $100,000 money laundering transaction that the source of CS1's money was drugs and weapons, and he said that defendant KIM had told him that CS1's money was from drugs and weapons.

**The SwissLoans Foundation Conspiracy**

Overt Act No. 116:  On June 27, 2012, defendant LU and CS1 met at the California Fish Grill restaurant, and they discussed other individuals who could launder money for CS1 besides defendant EDMUNDSON.

Overt Act No. 117:  On July 17, 2012, at the California Fish Grill restaurant, defendant LU introduced defendant Huynh to CS1 and told CS1 that defendant Huynh had an interest in helping CS1.

Overt Act No. 118:  On July 18, 2012, defendant Huynh called CS1 to explain the use of a foundation to launder money around the world and to bring funds into the United States.

Overt Act No. 119:  On July 26, 2012, at a Corner Bakery Cafe at the intersection of Brea Boulevard and Imperial Highway, in Brea, California (the "Brea Corner Bakery Cafe"), defendants LU and Huynh met with CS1, and defendant Huynh advised CS1 that the use of a foundation for money laundering was very secure and that CS1 should meet the owner of a foundation.

Overt Act No. 120:  On August 1, 2012, at the offices of defendant Ho's business, Rochester Enterprises, located at 2061 Business Center Drive, Suite 204, Irvine, California ("Rochester Enterprises"), defendant Huynh introduced the CS to defendant Ho, who both were told by CS1 that CS1 wanted to move dirty money from Korea, Thailand, Hong Kong, and Africa; and defendant Huynh told defendant Ho that CS1 wanted to convert cash into legal money.

Overt Act No. 121:  On August 1, 2012, at Rochester Enterprises, defendant Ho described for CS1 the use of a foundation as a vehicle for laundering money and defendant Ho asked CS1 to fill out an

application and provide a proof of funds for establishing such a foundation.

Overt Act No. 122:  On September 6, 2012, defendants LU, Huynh, and Ho received an email from UC2 with a proof of funds letter attached.

Overt Act No. 123:  On September 15, 2012, defendant Huynh sent an email to CS1 and UC2 providing an application for the establishment of a foundation, and defendant Huynh offered his help in filling out the application.

Overt Act No. 124:  On September 27, 2012, at Rochester Enterprises, defendants LU, Ho, and Huynh, when CS1 asked them whether he should put on the application form that CS1's money came from drug trafficking, all told CS1 to say no.

Overt Act No. 125:  On October 18, 2012, defendant LU, defendant Huynh, CS1, and UC2 met at an IHOP restaurant located at 18542 MacArthur Boulevard, Irvine, California ("Irvine IHOP restaurant"), to discuss setting up a foundation for laundering money.

Overt Act No. 126:  On October 18, 2012, defendants LU, Huynh, CS1, and UC2 met defendant Ho at Rochester Enterprises to discuss the use of foundations to launder money, and CS1 told them that CS1's money came from weapons, illegal arms businesses, and the sale of illegal drugs.

Overt Act No. 127:  On December 5, 2012, at a meeting at Rochester Enterprises, defendant Ho told CS1 that a foundation could be created, either by starting a new foundation or taking over an existing foundation, and that the foundation could be used to move cash around the world in order to clean it.

1       Overt Act No. 128:   On January 21, 2013, defendant Ho called CS1

2   and asked CS1 about the status of the foundation application.

3       Overt Act No. 129:   On February 19, 2013, defendant LU and CS1

4   met at a Starbucks parking lot located at the northeast intersection

5   of Imperial Highway and the 57 freeway, in Brea, California ("Brea

6   Starbucks"); and defendant LU told CS1 that defendant LU would be

7   meeting the next day with defendant Negele, who defendant LU

8   described as an associate of defendant Ho's from Switzerland

9   connected to a foundation in Liechtenstein.

10      Overt Act No. 130:   On February 19, 2013, at the Brea Starbucks,

11  defendant LU told CS1 that defendant Ho had asked defendant Negele to

12  fly over to the United States.

13      Overt Act No. 131:   On February 21, 2013, defendants Ho, LU,

14  Negele, J. Nguyen, CS1, and UC2 met at Rochester Enterprises to

15  discuss the use of a foundation to launder money.

16      Overt Act No. 132:   On February 21, 2013, at Rochester

17  Enterprises, defendant Ho introduced defendant J. Nguyen to CS1 as

18  legal counsel for the United States division of SwissLoans, a group

19  of financial services companies involved in the creation, purchase,

20  and management of foundations; and defendant Ho further introduced

21  defendant Negele as his boss from Lichtenstein, with 25 years banking

22  experience.

23      Overt Act No. 133:   On February 21, 2013, at Rochester

24  Enterprises, defendant Negele told UC2 that he had flown to the

25  United States just for this meeting with CS1 and UC2.

26      Overt Act No. 134:   On February 21, 2013, at Rochester

27  Enterprises, defendants Ho and Negele accepted a partially completed

28  foundation application from UC2.

Overt Act No. 135:  On February 21, 2013, at Rochester Enterprises, defendant Ho told UC2 that they were all free to talk because they all knew that what was going on was laundering.

Overt Act No. 136:  On February 21, 2013, at Rochester Enterprises, defendant Ho told UC2 to use the terms "protection" or "securitization" instead of the term "laundering."

Overt Act No. 137:  On February 21, 2013, at Rochester Enterprises, defendants LU, Ho, Negele, and J. Nguyen were told by UC2 that the money UC2 was looking to launder was from the sale of drugs in Europe that had been obtained by exchanging weapons for drugs in Nigeria.

Overt Act No. 138:  On February 21, 2013, at Rochester Enterprises, after hearing UC2 refer to the source of his funds, defendant Negele told UC2 that defendant Negele did not want to discuss again the source of UC2's money.

Overt Act No. 139:  On February 21, 2013, at Rochester Enterprises, defendant Ho stated that defendant Negele would clean UC2's money before moving it.

Overt Act No. 140:  On February 21, 2013, at Rochester Enterprises, defendant Negele told UC2 that defendant Negele risked going to jail for eight years by talking to UC2.

Overt Act No. 141:  On February 22, 2013, in a telephone call, defendant LU told CS1 that defendant Ho had informed him that there was a foundation available for purchase.

Overt Act No. 142:  On February 28, 2013, at the Irvine IHOP restaurant, defendant LU and CS1 discussed the creation of a foundation, and defendant LU told CS1 that it would be okay for CS1 to pay for the foundation with money that had not yet been laundered.

37

1    <u>Overt Act No. 143:</u>  On February 28, 2013, defendant LU and CS1
2    drove to Rochester Enterprises and met with defendants Ho, Negele,
3    and J. Nguyen to discuss the proposed creation of a foundation that
4    could be used to launder money.
5        <u>Overt Act No. 144:</u>  On February 28, 2013, at Rochester
6    Enterprises, defendant Ho said that he and his associates could clean
7    the money to be used for the startup fees for the foundation.
8        <u>Overt Act No. 145:</u>  On February 28, 2013, at Rochester
9    Enterprises, after CS1 started to explain the meaning of "not clean
10   money," defendant J. Nguyen interrupted CS1 and described the money
11   as "unaccounted," and defendant Ho said that they knew what CS1
12   meant.
13       <u>Overt Act No. 146:</u>  On March 28, 2013, at Rochester Enterprises,
14   defendant Ho told CS1 that the foundation they were discussing could
15   be used to move money anywhere in the world without detection.
16       <u>Overt Act No. 147:</u>  On March 28, 2013, at Rochester Enterprises,
17   defendant Ho said that if CS1 wanted to use the "dirty money" to
18   create the foundation first, CS1 could go to Negele's bank, Bank
19   Frick, and count it inside the back office.
20       <u>Overt Act No. 148:</u>  On March 28, 2013, at Rochester Enterprises,
21   defendant Ho said that the money could be brought back from the
22   foundation to the United States.
23       <u>Overt Act No. 149:</u>  On April 29, 2013, at Rochester Enterprises,
24   defendant LU told CS1 that they should prepare an explanation for
25   CS1's large cash transactions or else, during an investigation, they
26   might say inconsistent things.
27       <u>Overt Act No. 150:</u>  On August 14, 2013, at Foster
28   Pharmaceuticals, Ho's business located at 2062 Main Street, Suite

800, in Irvine, California ("Foster Pharmaceuticals"), defendants LU, Ho, Negele, and J. Nguyen, met with CS1 and UC2 to discuss a proposal from defendant Negele to set up a foundation.

Overt Act No. 151:  On August 14, 2013, at Foster Pharmaceuticals, defendant Negele said that he did not need his costs and fees associated with setting up the foundation to be paid by CS1 with clean money.

Overt Act No. 152:  On August 14, 2013, at Foster Pharmaceuticals, defendant Negele proposed cleaning CS1's money by sending people to the Zurich airport to change U.S. dollars to Euros or Swiss francs, and defendant Negele noted they could bring a minimum of ten people to change money at a fee of twenty five percent.

Overt Act No. 153:  On August 14, 2013, at Foster Pharmaceuticals, defendant LU said that defendant Negele could exchange money between different foundations and nobody would know.

Overt Act No. 154:  On August 18, 2013, defendant Ho proposed giving CS1 and UC2 $50,000 in an international wire from a foundation as proof of defendant Negele's ability to launder money through a foundation.

**Ben Ho Money Laundering Conspiracy**

**The Laundering of $300,000 on January 28, 2013**

Overt Act No. 155:  On September 27, 2012, at Rochester Enterprises, defendant Ho asked defendant LU whether defendant Ho could open an account at Saigon National Bank for Rochester Enterprises so defendant Ho could use the account to withdraw between $100,000 and $500,000 cash a month.

Overt Act No. 156:  On September 27, 2012, at Rochester Enterprises, defendant LU raised the issue of reporting requirements and suggested to defendant HO that defendant Ho use CS1 to convert cashier's checks to cash in amounts ranging from $100,000 to $500,000 each month.

Overt Act No. 157:  On October 4, 2012, at the Brodard Chateau Restaurant, located at 9100 Trask Avenue, Garden Grove, California ("Brodard Chateau restaurant"), defendants LU and Hunyh and CS1 discussed what fee CS1 should charge defendant Ho for providing defendant Ho with cash and what fee CS1 would then pay defendants LU and Hunyh.

Overt Act No. 158:  On October 18, 2012, at Ruth's Chris Steakhouse, located at 2961 Michelson Drive, Irvine, California, defendant Ho negotiated an agreement with CS1 to pay CS1 a three percent fee for providing defendant Ho approximately $300,000 in cash at the end of every month in exchange for a wire transfer or cashier's check.

Overt Act No. 159:  On October 22, 2012, defendant Ho called CS1, acknowledged knowing where the funds that CS1 wanted laundered came from, and proposed laundering $300,000 in cash.

Overt Act No. 160:  On November 26, 2012, defendant Ho called CS1 to propose that CS1 bring cash to defendant Ho and that the two of them would then go to a bank next door to wire the money back to CS1.

Overt Act No. 161:  On December 5, 2012, at a meeting at Rochester Enterprises, defendant Ho was told by CS1 that the money for the $300,000 money laundering transaction they were discussing consisted of drug proceeds.

Overt Act No. 162:  On December 5, 2012, at Rochester Enterprises, defendant Ho and CS1 agreed to launder $300,000 for a three percent fee, making the total amount involved in their money laundering transaction $309,000.

Overt Act No. 163:  On December 6, 2012, at the Brea Corner Bakery Cafe, defendants LU and Hyunh were told by CS1 that the source of the money for the January 2013 money laundering transaction was drug money.

Overt Act No. 164:  On December 6, 2012, at the Brea Corner Bakery Cafe, defendants LU, Huynh, and CS1 agreed that, out of the three percent fee that CS1 would receive for laundering defendant Ho's money, defendants LU and Hyunh would be paid a one percent fee.

Overt Act No. 165:  On January 28, 2013, defendant Ho and an unindicted co-conspirator met with CS1 at Rochester Enterprises in a private office where defendant Ho accepted a bag containing $300,000 in cash from CS1 and counted the blocks of cash.

Overt Act No. 166:  On January 28, 2013, an unindicted co-conspirator and CS1 met at the Bank of America branch located down the street at 18622 MacArthur Boulevard, Irvine, California ("Irvine BofA"), where the unindicted co-conspirator received wire transfer information from CS1, including the account name "Sunshine Enterprises," to which the wires would be sent.

Overt Act No. 167:  On January 28, 2013, at the Irvine BofA, an unindicted co-conspirator confirmed that CS1 had provided $300,000 in cash, that this cash would be exchanged for a wire totaling $309,000, and that the unindicted co-conspirator had begun the process of wiring the money.

Overt Act No. 168:  On January 28, 2013, at Rochester Enterprises, defendant Ho, speaking to an Irvine BofA bank employee by telephone, caused a cash transaction consisting of $300,000 to be converted into two wire transfers in the amounts of $150,000 and $159,000 and sent to the "Sunshine Enterprises" account.

Overt Act No. 169:  On January 28, 2013, at Rochester Enterprises, defendant Ho, after CS1 had learned that the wire transfers were completed, accepted $300,000 in U.S. currency from CS1.

Overt Act No. 170:  On February 19, 2013, defendant LU and CS1 met in a Starbucks parking lot located at the northeast intersection of Imperial Highway and the 57 freeway, in Brea, California (the "Brea Starbucks"), and defendant LU accepted $3,000 in cash as his fee for assisting in the laundering of $300,000 in cash.

Overt Act No. 171:  On February 19, 2013, at the Brea Starbucks, defendant LU told CS1, using the code term "candy," that defendant LU had told defendant Huynh to thank CS1 for defendant Huynh's fee from their last transaction.

Overt Act No. 172:  On February 19, 2013, defendant Hyunh called CS1 to thank him for his "candy."

**The Laundering of $300,000 on February 28, 2013**

Overt Act No. 173:  On February 21, 2013, at Rochester Enterprises, defendant Ho and CS1 set the date for their next money laundering transaction as February 28, 2013.

Overt Act No. 174:  On February 27, 2013, defendant Ho called CS1 to ask CS1 to send the wiring instructions again for their upcoming money laundering transaction.

Overt Act No. 175:  On February 28, 2013, defendant Ho caused two wire transactions, drawn on an account in the name of Rochester Enterprises at BofA, to be sent to the "Sunshine Enterprises" account in the amount of $150,000 each.

Overt Act No. 176:  On February 28, 2013, at Rochester Enterprises, defendant Ho told CS1 that defendant Ho had forgotten to include the $9,000 transaction fee in a wire transfer defendant Ho had caused to be sent, and defendant Ho told CS1 to take $9,000 in cash from the $300,000 in cash brought by CS1 to Rochester Enterprises.

Overt Act No. 177:  On February 28, 2013, at Rochester Enterprises, defendant Ho accepted $300,000 in cash from CS1.

Overt Act No. 178:  On February 28, 2013, at Rochester Enterprises, defendant Ho gave $9,000 in cash to CS1 as CS1's fee for laundering $300,000.

Overt Act No. 179:  On February 28, 2013, at Rochester Enterprises, defendant LU and CS1 met in a restroom at Rochester Enterprises and defendant LU accepted $3,000 in cash from CS1 as his fee for facilitating the laundering of the $300,000.

**The Laundering of $300,000 on March 28, 2013**

Overt Act No. 180:  On March 25, 2013, defendant LU called CS1 and agreed that CS1 would take care of a transaction with defendant Ho first and then would meet with defendant LU to deliver defendant LU's fee.

Overt Act No. 181:  On March 26, 2013, in a telephone conversation with CS1, defendant Ho confirmed that he would send the wire that was the subject of their next money laundering transaction the next day.

1    Overt Act No. 182:  On March 27, 2013, defendant Ho caused three
2    wire transactions to be sent, drawn on accounts in the name of
3    Rochester Enterprises at both Wells Fargo Bank and BofA, to the
4    "Sunshine Enterprises" account in the following amounts: $100,000,
5    $104,500, and $104,500.

6    Overt Act No. 183:  On March 28, 2013, at Rochester Enterprises,
7    defendant Ho accepted $300,000 in U.S. currency from CS1.

8    Overt Act No. 184:  On March 28, 2013, at Rochester Enterprises,
9    defendant Ho asked CS1 if the amount of their next money laundering
10   transaction could be increased to $500,000.

11   Overt Act No. 185:  On March 28, 2013, defendant LU met with CS1
12   at Saigon National Bank and accepted an envelope containing $3,000 in
13   cash that CS1 had placed on defendant LU's desk.

14   **The Laundering of $350,000 on April 29, 2013**

15   Overt Act No. 186:  On April 25, 2013, defendant Ho called CS1
16   to confirm that the next money laundering transaction would involve
17   $350,000, and defendant Ho told CS1 that he would send the wire
18   transfer that was the subject of the money laundering transaction the
19   following day.

20   Overt Act No. 187:  On April 26, 2013, defendant Ho caused to be
21   sent three wire transfers drawn on an account in the name of
22   Rochester Enterprises at BofA to the "Sunshine Enterprises" account
23   in the amounts of $150,000, $150,000, and $60,500, which amounts
24   included the $10,500 fee defendant Ho paid to CS1 for facilitating
25   their money laundering transaction.

26   Overt Act No. 188:  On April 29, 2013, defendant Ho met
27   defendant LU and CS1 at Rochester Enterprises, where defendant Ho
28   accepted and counted $350,000 in cash provided to him by CS1.

1    Overt Act No. 189:  On April 29, 2013, in a restroom at the

2    Brodard Chateau Restaurant, defendant LU accepted $3,500 in cash from

3    CS1 as his fee for facilitating the recent $350,000 money laundering

4    transaction.

5    **The Laundering of $350,000 on May 30, 2013**

6    Overt Act No. 190:  On May 16, 2013, defendant Ho, while having

7    breakfast with defendant LU, called CS1 and confirmed that defendant

8    Ho's wife, defendant Lien Tran ("L. Tran"), would receive the cash

9    and wire the funds related to their next money laundering

10   transaction.

11   Overt Act No. 191:  On May 24, 2013, defendant HO called CS1 and

12   told CS1 that he would arrange the wire transfer to CS1 that was the

13   subject of their latest money laundering transaction, that defendant

14   Tran would call CS1, and that CS1 would drop off the cash that was

15   the subject of the transaction with defendant Tran at defendant Ho's

16   house.

17   Overt Act No. 192:  On May 28, 2013, defendant Ho sent two wire

18   transfers in the amount of $180,250 each, drawn on the Rochester

19   Enterprises account at BofA, to the "Sunshine Enterprises" account,

20   which amount included the $10,500 fee defendant Ho paid to CS1 for

21   facilitating their latest money laundering transaction.

22   Overt Act No. 193:  On May 28, 2013, defendant Ho sent an email

23   to CS1 acknowledging that CS1 would deliver a package to defendant

24   Tran on May 30, 2013.

25   Overt Act No. 194:  On May 30, 2013, defendant Tran, while at

26   home in Santa Ana, California, and after being advised by CS1 that

27   the package being delivered to her contained all drug money, received

28

1  from CS1 and counted $350,000 in U.S. currency contained in the
2  package.

3      Overt Act No. 195:  On June 18, 2013, defendant LU met CS1
4  inside a restroom on the 8th floor of an office building located at
5  2603 Main Street in Irvine, California, where defendant LU accepted
6  $3,500 in U.S. currency from CS1 as a fee for facilitating the May
7  30, 2013 money laundering transaction.

8      **The Laundering of $350,000 on June 27, 2013**

9      Overt Act No. 196:  On June 18, 2013, at the offices of Foster
10 Pharmaceuticals, defendant Ho told CS1 that he would wire the money
11 that would be the subject of their next money laundering transaction
12 on June 26, 2013.

13     Overt Act No. 197:  On June 26, 2013, defendant Ho sent two wire
14 transfers in the amount of $182,500 each, drawn on an account in the
15 name of Rochester Enterprises at BofA, to the "Sunshine Enterprises"
16 account, which amount included a $10,500 fee defendant Ho had agreed
17 to pay CS1 for facilitating their latest money laundering
18 transaction.

19     Overt Act No. 198:  On June 27, 2013, at the offices of Foster
20 Pharmaceuticals, defendant Ho accepted $350,000 in cash from CS1.

21     Overt Act No. 199:  On June 27, 2013, in the restroom of the
22 offices of Foster Pharmaceuticals, defendant LU accepted $3,500 in
23 cash from CS1 as his fee for facilitating the June 27, 2013 money
24 laundering transaction.

25     Overt Act No. 200:  On August 2, 2013, during a telephone call,
26 defendant Ho was told by CS1 that defendant Ho overpaid CS1 by
27 approximately $4,000 when executing their latest money laundering
28 transaction, and defendant Ho agreed that CS1 would deduct the

1    overpayment the next time they engaged in a money laundering

2    transaction.

3        **Richard Cheung Conspiracy**

4        Overt Act No. 201:  On August 14, 2013, at Foster

5    Pharmaceuticals, defendant LU told CS1 and UC2 that he had another

6    client, defendant Cheung, who wanted to do monthly transactions like

7    the ones that CS1 had been doing with defendant Ho.

8        Overt Act No. 202:  On August 14, 2013, at Foster

9    Pharmaceuticals, defendant LU said that defendant Cheung knew that

10   the fee he needed to pay to launder money with the CS would be three

11   percent, that the amounts they would launder would probably be

12   $200,000 or $300,000 each month, and that their transactions would

13   involve an exchange of cash provided by CS1 for a wire transfer or

14   cashier's check to be paid by defendant Cheung.

15       Overt Act No. 203:  On September 22, 2013, at the Pacific Palms

16   Hotel in the City of Industry, California (the "Pacific Palms

17   Hotel"), defendants LU and Cheung met with CS1; defendant Cheung

18   described his need for cash in the amount of tens of thousands of

19   dollars per day, or $30,000 to $50,000 in cash per month; and

20   defendant Cheung agreed to wire money directly to CS1's account,

21   including CS1's fee, in exchange for cash provided by CS1.

22       Overt Act No. 204:  On September 22, 2013, at the Pacific Palms

23   Hotel, defendant Cheung was told by CS1 that CS1's cash was from the

24   sale of illegal drugs, including cocaine, and defendant Cheung asked

25   CS1 whether the wire transfers involved in their transactions would

26   be in round numbers, or whether they would have decimal points to

27   make them look like business transactions.

28

Overt Act No. 205: On September 22, 2013, at the Pacific Palms Hotel, defendant Cheung and CS1 discussed paying CS1 a fee anywhere from 3 to 5 percent to participate in their money laundering transaction, and they discussed which one of them would pay defendant LU.

Overt Act No. 206: On September 22, 2013, at the Pacific Palms Hotel, defendant Cheung asked CS1 whether he could help move cash from graft out of mainland China because defendant Cheung and his associates were not satisfied with the laundering speed and tax consequences of laundering money through casinos and Macau.

Overt Act No. 207: On September 22, 2013, at the Pacific Palms Hotel, defendant LU told defendant Cheung and CS1 that they would need a bank for the type of money laundering transactions they were discussing and advised them regarding how a bank would have to operate to be able to do these types of transaction.

Overt Act No. 208: On September 22, 2013, at the Pacific Palms Hotel, defendant Cheung suggested to CS1 that their money laundering transactions could happen either once a month or once every two months.

Overt Act No. 209: On November 1, 2013, at the Pacific Palms Hotel, defendant Cheung proposed on behalf of an associate a series of money laundering transactions in the amounts of $30,000 to $50,000 each month, and discussed procedures for creating false invoices to make the transactions appear legitimate.

Overt Act No. 210: On November 1, 2013, at the Pacific Palms Hotel, defendant Cheung proposed a $150,000 money laundering transaction for himself and proposed that transactions occur every other week.

48

**HERNANDEZ-HERRERA Money Laundering Conspiracy**

Overt Act No. 211:  On July 19, 2011, defendant LU called CS1, told CS1 that there was a lot of money coming from Mexico, and asked whether CS1 could facilitate the movement of the cash from Mexico to Hong Kong and defendant EDMUNDSON's account.

Overt Act No. 212:  On August 11, 2011, at the Red Restaurant located at the Pacific Palms Hotel, defendant LU told CS1 to save for defendant LU a portion of the transaction fees CS1 would earn for the international money laundering transactions from Mexico that defendant LU was referring to CS1.

Overt Act No. 213:  On August 11, 2011, at the Red Restaurant at the Pacific Palms Hotel, defendant LU stated that persons from Mexico had U.S. dollars in Mexico that they wanted to deposit in the United States and that they had opened an account at defendant LU's bank that had a balance of $2 million.

Overt Act No. 214:  On August 11, 2011, at the Red Restaurant at the Pacific Palms Hotel, defendant LU asked that CS1 receive cash from people in Mexico in the United States and wire it to accounts in Hong Kong or in Mexico; and defendant LU told CS1 that the amount to be laundered would be huge, based on a Wells Fargo account statement that he had reviewed showing transfers of $30 million per month.

Overt Act No. 215:  On August 11, 2011, at the Red Restaurant at the Pacific Palms Hotel, defendant LU stated that he did not want to negotiate with the people from Mexico and that CS1, defendant KIM, and defendant EDMUNDSON could handle the negotiations.

Overt Act No. 216:  On August 11, 2011, at the Red Restaurant at the Pacific Palms Hotel, defendant LU stated that he had introduced the people from Mexico to defendant KIM and that defendant

49

LU would also introduce CS1 to his connection from Mexico, who was located in Chula Vista, California.

Overt Act No. 217:   On August 11, 2011, at the Red Restaurant at the Pacific Palms Hotel, defendant LU stated that he would arrange a meeting with defendant HERRERA, a lawyer, and with defendant HERNANDEZ, a broker and friend of defendant LU's, to discuss a deal involving the movement of cash from Mexico.

Overt Act No. 218:   On August 11, 2011, at the Red Restaurant at the Pacific Palms Hotel, defendant LU told CS1 that there were two deals from Mexico involving defendant HERNANDEZ, and that defendant LU would help CS1 negotiate the first deal, and that if the first deal were successful, a second deal would follow.

Overt Act No. 219:   On August 11, 2011, at the Red Restaurant at the Pacific Palms Hotel, defendant LU told CS1 that the people in Mexico were having a hard time depositing money since defendant LU had been instructed by his director to freeze their account at Saigon National Bank, and, as a result, they could no longer deposit $1 million in cash per day into the account.

Overt Act No. 220:   On August 12, 2011, defendant KIM, during a telephone call with CS1, expressed doubt that the money involved in the Mexican deal was legitimate, and defendant KIM stated that he had told the people from Mexico that he did not need to hear whether the money involved in the deal was legitimate.

Overt Act No. 221:   On August 22, 2011, defendant KIM called CS1 and stated that defendant KIM should be at the meeting with the Mexicans, and defendant KIM stated that he assumed that the Mexicans at the meeting would be "Pablo" and "Emilio."

Overt Act No. 222:  On August 25, 2011, defendants LU, HERNANDEZ, HERRERA, and CS1 met at the Seafood World restaurant, located at 15351 Brookhurst Street, Suite 106, in Westminster, California (the "Seafood World restaurant"), where defendant LU introduced CS1 to defendants PABLO HERNANDEZ and EMILIO HERRERA as someone who could launder their money anywhere; and defendant HERNANDEZ told CS1 that his and defendant HERRERA's clients would like to deposit anywhere from $3 million to $10 million each day in the United States, in exchange for CS1 sending the money back to Mexico via wire transfers for a fee.

Overt Act No. 223:  On August 25, 2011, at the Seafood World restaurant, defendant HERRERA told CS1 that he practiced all kinds of law, including specifically, law related to the subject of money laundering.

Overt Act No. 224:  On August 25, 2011, at the Seafood World restaurant, defendants HERNANDEZ and LU, to explain why defendant HERNANDEZ and HERRERA wanted to deliver cash to CS1, told CS1 that banks would ask about the origins of their cash deposits.

Overt Act No. 225:  On August 25, 2011, at the Seafood World restaurant, defendant LU told CS1 that the deposit of a few million dollars in cash would frighten a bank, and defendant LU confirmed that CS1 would not require an explanation from defendants HERNANDEZ and HERRERA for the source of their cash.

Overt Act No. 226:  On August 25, 2011, at the Seafood World restaurant, defendant HERNANDEZ told CS1 that cash had been delivered to Saigon National Bank, but that defendant HERNANDEZ was looking for an additional bank where he could deposit up to $3 million to $5 million each day in cash that could then be wired back to Mexico.

51

1    Overt Act No. 227:  On August 25, 2011, at the Seafood World

2  restaurant, defendant LU said that a $200,000 cash deposit would

3  frighten a bank.

4    Overt Act No. 228:  On August 25, 2011, at the Seafood World

5  restaurant, defendant LU explained to CS1 in Cantonese that what

6  defendants HERNANDEZ and HERRERA were proposing to do was launder

7  unclean money from Mexico.

8    Overt Act No. 229:  On August 25, 2011, at the Seafood World

9  restaurant, while defendant LU and CS1 were conversing in Cantonese,

10  defendant HERNANDEZ told defendant HERRERA in Spanish that CS1 wanted

11  to know more than he could be told.

12    Overt Act No. 230:  On August 25, 2011, at the Seafood World

13  restaurant, defendant LU said that the cash they were discussing

14  could be delivered by defendants HERNANDEZ and HERRERA to Credes

15  corporation in Chula Vista, California, and that that corporation

16  would provide the cash to CS1 that CS1 would then arrange to be wired

17  back to Mexico.

18    Overt Act No. 231:  On August 25, 2011, at the Seafood World

19  restaurant, defendant HERNANDEZ confirmed that he had a business in

20  the United States called Credes located in Chula Vista, California.

21    Overt Act No. 232:  On August 25, 2011, at the Seafood World

22  restaurant, defendant HERRERA summarized the transactions being

23  proposed by telling CS1 that, in exchange for cash provided to CS1,

24  CS1 would send a wire transfer in return, and defendant LU

25  interrupted defendant HERRERA and stated that the wire transfer sent

26  in exchange for the cash would be in an amount that subtracted the

27  commission for doing the transaction.

28

Overt Act No. 233:  On August 25, 2011, at the Seafood World restaurant, defendants LU, HERNANDEZ, HERRERA, and CS1 discussed the fees that each of them would be paid to conduct the proposed money laundering transactions, and defendants LU and HERNANDEZ stated that the transactions would constitute money laundering.

Overt Act No. 234:  On August 25, 2011, at the Seafood World restaurant, defendant LU told defendants HERNANDEZ and HERRERA that defendant LU and CS1 could handle a transaction in which the cash would come from Mexico, as opposed to from a business in the United States, but the commission to conduct such a transaction would be higher.

Overt Act No. 235:  On August 25, 2011, at the Seafood World restaurant, defendant HERNANDEZ was told by CS1 that CS1 wanted to limit their first deal to $1 million, and defendant HERNANDEZ asked how long it would take for CS1 to consider doing deals amounting to more than $1 million and asked if he could provide CS1 with $1 million every day for CS1 to transfer back to Mexico.

Overt Act No. 236:  On August 25, 2011, at the Seafood World restaurant, defendant LU suggested that the wire transfers sent by CS1 go back to Panama instead of Mexico, but defendants HERNANDEZ and HERRERA told defendant LU and CS1 that Panama was not an option because their people had had $100 million in drug money confiscated in Panama.

Overt Act No. 237:  On August 25, 2011, at the Seafood World restaurant, defendant LU told defendant HERNANDEZ that defendant HERNANDEZ must listen to defendant LU about how to conduct the transactions so as to avoid the closure of any account used to receive cash deposits.

53

Overt Act No. 238:  On September 10, 2011, during a telephone conversation between defendant HERNANDEZ and CS1, CS1 asked defendant HERNANDEZ who the source of the cash was, and defendant HERNANDEZ told CS1 to use his imagination.

Overt Act No. 239:  On October 4, 2011, at the Alhambra Starbucks, defendant KIM told CS1 that the "Mexican group" was on a financial watch list, that they had been bringing $35 million per month in cash across the border, and that it was all dirty funds.

Overt Act No. 240:  On October 6, 2011, at the California Fish Grill restaurant, defendant LU told CS1 that clients of defendants HERNANDEZ and HERRERA were on a financial blacklist because of their deposits of $30 million per month at Wells Fargo and Scotia banks.

Overt Act No. 241:  On October 6, 2011, at the Fish Grill restaurant, defendant LU told CS1 that he had met with defendant HERNANDEZ at Saigon National Bank to review a list of names on a financial watch list to make sure that defendant HERNANDEZ's name was not on the list.

Overt Act No. 242:  On October 6, 2011, at the California Fish Grill restaurant, defendant LU explained to CS1 that any person on the financial watch list could not be permitted to open a bank account.

Overt Act No. 243:  On October 6, 2011, at the California Fish Grill restaurant, defendant LU told CS1 that defendant HERNANDEZ had laundered $2 million through Saigon National Bank and that defendant LU was concerned about an upcoming government audit of Saigon National Bank's books.

Overt Act No. 244:  On October 28, 2011, at the Corner Bakery Cafe, located at 2789 N. Main Street, Santa Ana, California (the

1  "Santa Ana Corner Bakery Cafe"), defendant HERNANDEZ met and told CS1
2  that the people in Mexico would only provide a wire transfer or
3  checks, but not cash anymore.

4      Overt Act No. 245:  On October 28, 2011, at the Santa Ana Corner
5  Bakery Cafe, when CS1 asked defendant HERNANDEZ what kind of money
6  they were handling, defendant HERNANDEZ stated that he did not want
7  to ask many questions of these guys.

8      Overt Act No. 246:  On October 28, 2011, at the Santa Ana Corner
9  Bakery restaurant, defendant HERNANDEZ stated that he, defendant
10 HERRERA and a friend of defendant HERRERA's wanted to be paid a
11 commission in return for their involvement in the money laundering
12 transactions.

13     Overt Act No. 247:  On November 11, 2011, at the California Fish
14 Grill restaurant, defendant LU met and told CS1 that he hoped to get
15 a cut of the money laundering transactions based on his role in
16 introducing defendants HERNANDEZ and HERRERA to CS1.

17     Overt Act No. 248:  On November 14, 2011, defendant HERNANDEZ
18 told CS1 in a telephone call that he would send the details related
19 to account names and checks to CS1 via email.

20     Overt Act No. 249:  On January 12, 2012, defendant HERNANDEZ
21 called CS1 and said that his people were ready and that they had
22 $300,000 in cash to be sent into Guadalajara, and defendant HERNANDEZ
23 asked if CS1 could handle this transaction.

24     Overt Act No. 250:  On January 20, 2012, at the California Fish
25 Grill restaurant, defendant LU told CS1 that defendant HERNANDEZ had
26 several clients in Mexico who specialize in "overseas remittance,"
27 which was all about money laundering, and that defendant HERRERA knew
28 these clients.

Overt Act No. 251:  On March 28, 2012, at the Santa Ana Corner Bakery Cafe, defendant HERNANDEZ asked CS1 to be paid a fee as part of a money laundering transaction.

Overt Act No. 252:  On March 28, 2012, at the Santa Ana Corner Bakery Cafe, defendant HERNANDEZ stated that the amount to be transferred was as much as $3 million and that the transactions would occur monthly.

Overt Act No. 253:  On March 28, 2012, at the Santa Ana Corner Bakery Cafe, defendant HERNANDEZ said that he was asking to be paid an additional one percent fee for defendant HERRERA.

Overt Act No. 254:  On March 30, 2012, defendant HERNANDEZ left a voicemail message for CS1 in which he said that he had talked to his friends and they agreed upon everything that defendant HERNANDEZ and CS1 had talked about.

Overt Act No. 255:  On April 21, 2012, defendant HERNANDEZ called CS1 and stated that he had friends who were ready to start; that they had cash in Phoenix, Arizona; Kansas; and elsewhere; and that CS1 should send the cash to a location in Mexico.

Overt Act No. 256:  On April 23, 2012, defendant HERNANDEZ called CS1 and said that he had a person in Canada who wanted to deposit funds in CS1's account in Los Angeles that CS1 could then send the money back to Mexico for defendant HERNANDEZ.

Overt Act No. 257:  On April 24, 2012, defendant HERNANDEZ, in a telephone conversation with CS1, stated that his clients had a problem and that they were going to have to postpone the transaction for a while.

Overt Act No. 258:  On May 30, 2012, defendant HERNANDEZ called CS1 and told him that he had a different group of friends who wanted

56

to send $600,000 from Mexico City to a bank account in Hong Kong, and that they wanted to repeat such a transaction, for the same amount, every three weeks.

Overt Act No. 259:  On June 10, 2012, defendant HERNANDEZ called CS1 and said that his friends in Mexico were waiting to start with "600" from Guadalajara to Hong Kong.

Overt Act No. 260:  On August 23, 2012, at Renato's restaurant, located at 15383 Brookhurst Street, Westminster, California ("Renato's Restaurant"), defendants LU, HERNANDEZ, and HERRERA met CS1 and defendant HERNANDEZ asked CS1 if CS1 could receive $500,000 every day and deliver that amount to Tijuana the same day.

Overt Act No. 261:  On August 23, 2012, at Renato's restaurant, defendant HERRERA asked CS1 what percentage he would charge for receiving cash and then wiring the amount of cash received back to Mexico, to which CS1 responded four percent.

Overt Act No. 262:  On August 23, 2012, at Renato's restaurant, defendant HERRERA told defendants HERNANDEZ, LU, and CS1 that the amount of money they were discussing was $10 million every month.

Overt Act No. 263:  On August 23, 2012, at Renato's restaurant, defendant HERRERA said that he was already laundering money through his personal bank accounts but that Chase Bank, Wells Fargo Bank, and U.S. Bank were closing his accounts.

Overt Act No. 264:  On August 23, 2012, at Renato's restaurant, defendant HERNANDEZ said that they had already tried to launder money with an account at Saigon National Bank but that their account at this bank had been closed.

Overt Act No. 265:  On August 23, 2012, at Renato's restaurant, defendant HERNANDEZ said that after the account had been closed at Saigon National Bank they had tried to buy Saigon National Bank.

Overt Act No. 266:  On August 23, 2012, at Renato's restaurant, while defendants HERNANDEZ and HERRERA were speaking to each other in Spanish, defendant LU spoke to CS1 in Cantonese and told CS1 not to lower his fee because defendants HERNANDEZ and HERRERA had no other place to turn to for help with their transactions.

Overt Act No. 267:  On August 23, 2012, at Renato's restaurant, defendant HERRERA said that he had been bringing $3 million over from Mexico every day, and defendant HERNANDEZ agreed that if something happened to the $3 million, CS1 would disappear.

Overt Act No. 268:  On August 23, 2012, at Renato's restaurant, defendant HERNANDEZ told CS1 that once their people begin working with CS1, he would not need any other business because the money CS1 would be handling would amount to more than $10 million each week.

Overt Act No. 269:  On August 23, 2012, at Renato's restaurant, defendant HERNANDEZ sought to have CS1 reduce his money laundering fee from four percent to three percent, so that defendants HERNANDEZ and HERRERA could split the remaining one percent.

Overt Act No. 270:  On August 23, 2012, at Renato's restaurant, defendant HERNANDEZ asked CS1 what CS1 would need to start processing cash.

Overt Act No. 271:  On September 17, 2012, defendant HERNANDEZ called CS1 and asked for CS1 to send bank documentation to him.

Overt Act No. 272:  On September 25, 2012, defendant HERNANDEZ called CS1 and acknowledged having received an email from CS1 regarding CS1's bank documentation in the form of a proof of funds.

Overt Act No. 273:  On October 25, 2013, at an IHOP restaurant located at the intersection of Oceanside Boulevard and State Tree, in Oceanside, California (the "Oceanside IHOP restaurant"), defendant HERNANDEZ met and told CS1 that this type of business was more or less like laundering.

Overt Act No. 274:  On October 25, 2013, at the Oceanside IHOP restaurant, defendant HERNANDEZ said that the fee for their transactions would be ten percent, that CS1 should keep three, and that he would be splitting the seven percent with defendant HERRERA and an unnamed person.

Overt Act No. 275:  On February 18, 2014, defendant HERNANDEZ called CS1 and said that somebody wanted CS1's services and suggested starting with $100,000.

Overt Act No. 276:  On May 13, 2014, defendant HERNANDEZ called CS1 and said he had a friend who wanted to send money from Canada to CS1's account and then to have CS1 send it to Mexico.

Overt Act No. 277:  On September 12, 2014, in a parking lot located between a Jack-in-the-Box restaurant and Kentucky Fried Chicken restaurant at the intersection of Broadway and Palomar Streets in Chula Vista, California (the "Broadway and Palomar parking lot"), defendant HERNANDEZ told CS2 that a big drug lord was coming from Colombia, that defendant HERNANDEZ had been talking on the phone with him, that you could get anything you wanted from the drug lord, that his merchandise was very good, and that the drug lord would give them the merchandise on credit.

Overt Act No. 278:  On September 12, 2014, in the Broadway and Palomar parking lot, defendant HERNANDEZ also told CS2 that there were people from Sinaloa who were Chapo's people, that they had $300

1    million they wanted to launder, and that defendant HERNANDEZ had

2    asked them for a three percent commission for laundering money, which

3    they said was no problem.

**Efforts by HERNANDEZ and HERRERA to Purchase**
**Saigon National Bank**

Overt Act No. 279:  On October 4, 2011, at the Alhambra

Starbucks, defendant KIM told CS1 and UC2 that the group from Mexico

had been trying to buy Saigon National Bank.

Overt Act No. 280:  On October 6, 2011, at the California Fish

Grill restaurant, defendant LU told CS1 that someone associated with

defendant HERNANDEZ had bought $1 million worth of shares in Saigon

National Bank.

Overt Act No. 281:  On October 28, 2011, at the Santa Ana Corner

Bakery Cafe, defendant HERNANDEZ told CS1 that the people they worked

with in Mexico had already bought $1 million in shares in Saigon

National Bank and were still waiting to buy the bank.

Overt Act No. 282:  On October 28, 2011, at the Corner Bakery

Cafe, defendant HERNANDEZ said that the purpose for buying Saigon

National Bank was to clean or launder money.

Overt Act No. 283:  On August 23, 2012, at Renato's Restaurant,

defendants LU, HERNANDEZ, and HERRERA met CS1 and defendant HERNANDEZ

said that after the account they used at Saigon National Bank had

been cancelled, they had tried to buy Saigon National Bank.

Overt Act No. 284:  On August 23, 2012, at Renato's restaurant,

defendant HERRERA asked defendant LU how much he wanted for the

majority shareholder's shares of Saigon National Bank.

Overt Act No. 285:  On August 23, 2012, at Renato's restaurant,

defendant HERRERA said that he knew people who had $5 million in cash

in the United States, and defendant HERNANDEZ asked defendant LU if defendant HERRERA could use that cash to become one of the shareholders in Saigon National Bank.

Overt Act No. 286:  On August 23, 2012, at Renato's restaurant, defendant HERRERA stated that he was interested in buying the bank shares in order to guarantee their movements and accomplish their work.

COUNT TWO

[18 U.S.C. § 1956(h)]

1.     Paragraphs 1 through 10 of the General Allegations are re-alleged and incorporated by reference as if fully set forth herein.

A.     OBJECTS OF THE CONSPIRACY

2.     Beginning on a date unknown and continuing until on or about January 24, 2011, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants TU CHAU LU, also known as ("aka") "William Lu," aka "Bill Lu," aka "Bill," aka "Uncle Bill" ("LU"), TSUNG WEN HUNG, aka "Peter Hung," aka "Peter" ("HUNG"), LUIS KRUEGER ("KRUEGER"), LI JESSICA WEI, aka "Wei Jessica Li," aka "Ji Li Wei," aka "Wei Ji Li," aka "Jenny" ("WEI"), DU TRUONG NGUYEN, aka "Andrew" ("D. NGUYEN"), and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit the following offenses:

        a.     To knowingly conduct or attempt to conduct financial transactions, affecting interstate and foreign commerce, believing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

        b.     To knowingly conduct or attempt to conduct financial transactions, affecting interstate and foreign commerce, believing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole or in part to avoid a transaction

1    reporting requirement under State or Federal law, in violation of

2    Title 18, United States Code, Section 1956(a)(1)(B)(ii).

3    B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE

4         ACCOMPLISHED

5         3.   The objects of the conspiracy were to be accomplished, in

6    substance, as follows:

7              a.   Defendant LU would make arrangements for money

8    laundering transactions to be conducted at different banks by

9    different individuals, including bank insiders.

10             b.   Defendants HUNG, KRUEGER, and D. NGUYEN would receive

11   cash from a Cooperating Source ("CS") who represented that the cash

12   was the proceeds of specified unlawful activity.

13             c.   Defendants LU, HUNG, KRUEGER, and D. NGUYEN, and

14   others known and unknown to the Grand Jury, would cause cashier's

15   checks to be prepared in exchange for the cash provided by CS1.

16             d.   Defendants HUNG, KRUEGER, and D. NGUYEN, and others

17   known and unknown to the Grand Jury, would arrange to have the

18   cashier's checks made out to a fictitious name provided by CS1.

19             e.   Defendants KRUEGER and D. NGUYEN would provide the

20   fraudulently obtained cashier's checks to CS1 in exchange for the

21   cash provided by CS1.

22             f.   Defendants LU, HUNG, KRUEGER, WEI, and D. NGUYEN, and

23   others known and unknown to the Grand Jury, would accept a fee in

24   return for converting the cash provided by CS1 into cashier's checks.

25   C.   OVERT ACTS

26        4.   In furtherance of the conspiracy and to accomplish the

27   objects of the conspiracy, on or about the following dates,

28   defendants LU, HUNG, KRUEGER, WEI, and D. NGUYEN, and others known

and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, Overt Acts numbered 1 through 27 as set forth in Count One, which are re-alleged and incorporated by reference as if fully set forth herein.

COUNT THREE

[18 U.S.C. §§ 1956(a)(3)(B), (C), 2(a), (b)]

On or about December 6, 2010, in Orange County, within the Central District of California, and elsewhere, defendant TSUNG WEN HUNG, also known as ("aka") "Peter Hung," aka "Peter" ("HUNG"), and others known and unknown to the Grand Jury, with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, that is, the felonious importation, receiving, buying, selling, and otherwise dealing in controlled substances punishable under a law of the United States ("drug trafficking"), and with the intent to avoid a transaction reporting requirement under State or Federal law, that is, through the filing of a materially false Currency Transaction Report, knowingly conducted, attempted to conduct, caused to be conducted, aided, abetted, counseled, commanded, induced, and procured the following financial transaction, affecting interstate commerce, involving property represented by an authorized agent of the United States government to be proceeds of specified unlawful activity, that is, drug trafficking:

Transaction: The exchange of two cashier's checks payable to United Business Associates, dated December 6, 2010, numbers 02381 and 02382, in the amount of $100,000 each, at Saigon National Bank, for $200,000 in cash, plus a $20,000 fee.

COUNT FOUR

[18 U.S.C. §§ 1956(a)(3)(B), (C), 2(a), (b)]

On or about January 24, 2011, in Orange County, within the Central District of California, and elsewhere, defendant TSUNG WEN HUNG, also known as ("aka") "Peter Hung," aka "Peter" ("HUNG"), and others known and unknown to the Grand Jury, with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, that is, the felonious importation, receiving, buying, selling, and otherwise dealing in controlled substances punishable under a law of the United States ("drug trafficking"), and with the intent to avoid a transaction reporting requirement under State or Federal law, that is, through the filing of a materially false Currency Transaction Report, knowingly conducted, attempted to conduct, caused to be conducted, aided, abetted, counseled, commanded, induced, and procured the following financial transaction, affecting interstate commerce, involving property represented by an authorized agent of the United States government to be proceeds of specified unlawful activity, that is, drug trafficking:

Transaction:  The exchange of a cashier's check payable to United Business Associates, dated January 24, 2011, number 424250587, in the amount of $250,000 at the Bank of America, for $250,000 in cash, plus a $25,000 fee.

COUNT FIVE

[18 U.S.C. § 1956(h)]

1.     Paragraphs 1 through 10 of the General Allegations are re-alleged and incorporated by reference as if fully set forth herein.

A.     OBJECTS OF THE CONSPIRACY

2.     Beginning on a date unknown and continuing until on or about a date unknown, but no earlier than March 31, 2011, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants TU CHAU LU, also known as ("aka") "William Lu," aka "Bill Lu," aka "Bill" aka "Uncle Bill" ("LU"), TSUNG WEN HUNG, aka "Peter Hung," aka "Peter" ("HUNG"), and EDWARD KIM, aka "Eddie" ("KIM"), and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit the following offenses:

a.     To knowingly conduct or attempt to conduct financial transactions, affecting interstate and foreign commerce, believing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

b.     To knowingly conduct or attempt to conduct financial transactions, affecting interstate and foreign commerce, believing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole or in part to avoid a transaction

1  reporting requirement under State or Federal law, in violation of

2  Title 18, United States Code, Section 1956(a)(1)(B)(ii).

3  B.  MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE

4      ACCOMPLISHED

5      3.   The objects of the conspiracy were to be accomplished, in

6  substance, as follows:

7           a.   Defendant LU would make arrangements to sell shares of

8  Saigon National Bank to associates of a Cooperating Source ("CS1") so

9  that Saigon National Bank could be used to conduct money laundering

10 transactions.

11          b.   Defendants LU and HUNG would arrange for any sale of

12 Saigon National Bank to CS1's associates to be conducted without

13 regulatory approvals.

14          c.   Defendant LU would arrange for CS1 to enter into a

15 Consultant Agreement with Saigon National Bank in which CS1 would

16 receive a fee as part of any bank sale.

17          d.   Defendants LU and HUNG would share in the consultancy

18 fee received by CS1 as part of any sale of Saigon National Bank.

19          e.   Defendant LU would arrange for CS1 to meet with the

20 Chairman of the Board of Saigon National Bank to discuss the sale of

21 shares of Saigon National Bank to CS1's associates.

22          f.   Defendants LU, HUNG, and KIM would control Saigon

23 National Bank after CS1's associates purchased the bank, and they

24 would then take care of CS1's money laundering transactions at Saigon

25 National Bank.

26 C.  OVERT ACTS

27     4.   In furtherance of the conspiracy and to accomplish the

28 objects of the conspiracy, defendants LU, HUNG, and KIM, and others

68

known and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, Overt Acts numbered 28 through 63 as set forth in Count One, which are re-alleged and incorporated by reference as if fully set forth herein.

COUNT SIX

[18 U.S.C. § 1956(h)]

1.   Paragraphs 1 through 10 of the General Allegations are re-alleged and incorporated by reference as if fully set forth herein.

A.   OBJECTS OF THE CONSPIRACY

2.   Beginning on a date unknown and continuing until on or about October 20, 2011, in Los Angeles County, within the Central District of California, and elsewhere, defendants TU CHAU LU, also known as ("aka") "William Lu," aka "Bill Lu," aka "Bill," aka "Uncle Bill" ("LU"), EDWARD KIM, aka "Eddie" ("KIM"), JOHN EDMUNDSON ("EDMUNDSON"), and MINA CHAU ("CHAU"), and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit the following offenses:

a.   To knowingly conduct or attempt to conduct financial transactions, affecting interstate and foreign commerce, believing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i);

b.   To knowingly conduct or attempt to conduct financial transactions, affecting interstate and foreign commerce, believing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole or in part to avoid a transaction reporting requirement under State or Federal law, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(ii); and

70

c.   To knowingly transport, transmit, and transfer monetary instruments and funds from a place in the United States to and through a place outside the United States and to and through a place in the United States from and through a place outside the United States, believing that the property involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

3.   The objects of the conspiracy were to be accomplished, in substance, as follows:

a.   Defendant LU would make arrangements for money laundering transactions to be conducted at different banks by different individuals, including bank insiders.

b.   Defendants KIM and CHAU would receive cash from a Cooperating Source ("CS") who had represented to defendant KIM that the cash was the proceeds of specified unlawful activity.

c.   Defendants KIM and CHAU would cause cashier's checks to be prepared in exchange for the cash provided by CS1.

d.   Defendants LU, KIM, and CHAU would arrange to have the cashier's checks and wire transfers made out to a fictitious name provided by CS1.

e.   Defendant CHAU would provide the fraudulently obtained cashier's checks to CS1.

71

f.    Defendants LU, KIM, and CHAU would receive a fee in return for converting the cash provided by CS1 into cashier's checks.

g.    Defendants LU, KIM, and EDMUNDSON would arrange an international money laundering transaction involving wire transfers from CS1, represented to be the proceeds from the sales of weapons trafficking and drug trafficking, through defendant EDMUNDSON's Bank of China account, back to an account represented to be controlled by CS1.

h.    Defendants LU, KIM, and EDMUNDSON would receive a fee for conducting this international money laundering transaction.

C.    OVERT ACTS

4.    In furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendants LU, KIM, CHAU, and EDMUNDSON, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, Overt Acts numbered 64 through 115 as set forth in Count One, which are re-alleged and incorporated by reference as if fully set forth herein.

COUNT SEVEN

[18 U.S.C. §§ 1956(a)(3)(B), (C), 2(a), (b)]

On or about March 14, 2011, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants TU CHAU LU, also known as ("aka") "William Lu," aka "Bill Lu," aka "Bill," aka "Uncle Bill" ("LU"), and EDWARD KIM, aka "Eddie," ("KIM"), while aiding and abetting each other and others known and unknown to the Grand Jury, with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, that is, bribery of a domestic and foreign corrupt official and the felonious importation, receiving, buying, selling, and otherwise dealing in controlled substances punishable under a law of the United States ("drug trafficking"), and with the intent to avoid a transaction reporting requirement under State or Federal law, that is, the filing of a materially false Currency Transaction Report, knowingly conducted, attempted to conduct, and caused to be conducted the following financial transaction, affecting interstate commerce, involving property represented by an authorized agent of the United States government to be proceeds of specified unlawful activity, that is, bribery of a domestic and foreign corrupt official and drug trafficking:

Transaction:  The exchange of a cashier's check payable to United Business Associates, dated March 14, 2011, number 7321601138, in the amount of $350,000 at the Wells Fargo Bank, for $350,000 in cash, plus a $28,000 fee.

COUNT EIGHT

[18 U.S.C. §§ 1956(a)(3)(B), (C), 2(a), (b)]

On or about June 20, 2011, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants TU CHAU LU, also known as ("aka") "William Lu," aka "Bill Lu," aka "Bill," aka "Uncle Bill" ("LU"), and EDWARD KIM, aka "Eddie," ("KIM"), while aiding and abetting each other and others known and unknown to the Grand Jury, with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, that is, the felonious importation, receiving, buying, selling, and otherwise dealing in controlled substances punishable under a law of the United States ("drug trafficking"), and with the intent to avoid a transaction reporting requirement under State or Federal law, that is, through the filing of a materially false Currency Transaction Report, knowingly conducted, attempted to conduct, and caused to be conducted the following financial transaction, affecting interstate commerce, involving property represented by an authorized agent of the United States government to be proceeds of specified unlawful activity, that is, drug trafficking:

Transaction:  The exchange of two cashier's checks payable to Dean Investment, dated June 20, 2011, numbers 1144906932 and 0014401593, in the amount of $200,000 each at the Chase Bank and Wells Fargo Bank, for $400,000 in cash, plus a $32,000 fee.

COUNT NINE

[18 U.S.C. §§ 1956(a)(3)(B), (C), 2(a), (b)]

On or about September 20, 2011, in Orange County, within the Central District of California, and elsewhere, defendants TU CHAU LU, also known as ("aka") "William Lu," aka "Bill Lu," aka "Bill," aka "Uncle Bill" ("LU"), defendant EDWARD KIM, aka "Eddie" ("KIM"), and JOHN EDMUNDSON ("EDMUNDSON"), while aiding and abetting each other and others known and unknown to the Grand Jury, with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, that is, the felonious importation, receiving, buying, selling, and otherwise dealing in controlled substances punishable under a law of the United States ("drug trafficking"), and with the intent to avoid a transaction reporting requirement under State or Federal law, that is, through the filing of a materially false Currency Transaction Report, knowingly conducted, attempted to conduct, and caused to be conducted the following financial transaction, affecting interstate commerce, involving property represented by an authorized agent of the United States government to be proceeds of specified unlawful activity, that is, drug trafficking:

Transaction:  The exchange of two cashier's checks payable to Executive Real Estate, dated September 20, 2011, numbers 1144907755 and 0014401607, in the amount of $250,000 each at the Chase Bank and the Wells Fargo Bank, for $500,000 in cash, plus a $35,000 fee.

COUNT TEN

[18 U.S.C. §§ 1956(a)(3)(B), 2(a), (b)]

On or about October 13, 2011, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants TU CHAU LU, also known as ("aka") "William Lu," aka "Bill Lu," aka "Bill," aka "Uncle Bill" ("LU"), EDWARD KIM, aka "Eddie," ("KIM"), and JOHN EDMUNDSON ("EDMUNDSON"), while aiding and abetting each other, and together with others known and unknown to the Grand Jury, with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, that is, the felonious importation, receiving, buying, selling, and otherwise dealing in controlled substances punishable under a law of the United States ("drug trafficking"), and the felonious purchase of missile systems designed to destroy aircraft (the "purchase of anti-aircraft weapons"), knowingly conducted, attempted to conduct, and caused to be conducted the following financial transaction, affecting interstate and foreign commerce, involving property represented by an authorized agent of the United States government to be proceeds of specified unlawful activity, that is, drug trafficking and the purchase of anti-aircraft weapons:

Transaction:  The exchange of a wire transfer in the amount of $100,000 through a Bank of China (Hong Kong) LTD. account in the name of John Francis Edmundson, account number XXX-XXX-X-XX6047-2, for $100,000 cash, minus transaction fees.

COUNT ELEVEN

[18 U.S.C. § 1956(h)]

1.    Paragraphs 1 through 10 of the General Allegations are re-alleged and incorporated by reference as if fully set forth herein.

A.    OBJECTS OF THE CONSPIRACY

2.    Beginning on a date unknown and continuing until on or about August 18, 2013, in Orange County, within the Central District of California, and elsewhere, defendants TU CHAU LU, also known as ("aka") "William Lu," aka "Bill Lu," aka "Bill," aka "Uncle Bill" ("LU"), BEN HO ("HO"), TOM HUYNH, aka "The Fat Guy" ("HUYNH"), RENALDO NEGELE ("NEGELE"), and JACK NGUYEN ("J. NGUYEN"), and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit the following offenses:

        a.    To knowingly transport, transmit, and transfer monetary instruments and funds from a place in the United States to and through a place outside the United States and to and through a place in the United States from and through a place outside the United States, believing that the property involved in the transportation, transmission and transfer represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i); and

        b.    To knowingly transport, transmit, and transfer monetary instruments and funds from a place in the United States to and through a place outside the United States and to and through a place in the United States from and through a place outside the

1   United States, believing that the property involved in the

2   transportation, transmission, and transfer represented the proceeds

3   of some form of unlawful activity, and knowing that the transactions

4   were designed in whole or in part to avoid a transaction reporting

5   requirement under State or Federal law, in violation of Title 18,

6   United States Code, Section 1956(a)(2)(B)(ii).

7   B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE

8       ACCOMPLISHED

9       3.   The objects of the conspiracy were to be accomplished, in

10  substance, as follows:

11         a.   Defendants LU, HO, HUYNH, NEGELE, and J. NGUYEN would

12  agree to set up a foundation overseas that could be used to receive

13  cash from a Cooperating Source ("CS"), who represented that the cash

14  was the proceeds of specified unlawful activity.

15         b.   Defendants LU, HO, and HUYNH would agree that the

16  money laundered through the foundation would be returned to the

17  United States.

18         c.   Defendants LU, HO, and HUYNH would assist CS1 in

19  completing an application for the creation of a foundation.

20  C.   OVERT ACTS

21       4.   In furtherance of the conspiracy and to accomplish the

22  objects of the conspiracy, defendants LU, HO, HUYNH, NEGELE and J.

23  NGUYEN, and others known and unknown to the Grand Jury, committed

24  various overt acts within the Central District of California, and

25  elsewhere, including, but not limited to, Overt Acts numbered 116

26  through 154 as set forth in Count One, which are re-alleged and

27  incorporated by reference as if fully set forth herein.

28

COUNT TWELVE

[18 U.S.C. § 1956(h)]

1.    Paragraphs 1 through 10 of the General Allegations are re-alleged and incorporated by reference as if fully set forth herein.

A.    OBJECTS OF THE CONSPIRACY

2.    Beginning on a date unknown and continuing until on or about June 27, 2013, in Orange County, within the Central District of California, and elsewhere, defendants TU CHAU LU, also known as ("aka") "William Lu," aka "Bill Lu," aka "Bill," aka "Uncle Bill" ("LU"), BEN HO ("HO"), and TOM HUYNH, aka "The Fat Guy" ("HUYNH"), and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit the following offenses:

a.    To knowingly conduct or attempt to conduct financial transactions, affecting interstate and foreign commerce, believing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

b.    To knowingly conduct or attempt to conduct financial transactions, affecting interstate and foreign commerce, believing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole or in part to avoid a transaction reporting requirement under State or Federal law, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(ii).

79

B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE
ACCOMPLISHED

3.   The objects of the conspiracy were to be accomplished, in substance, as follows:

a.   Defendants LU and HUYNH would facilitate money laundering transactions involving the exchange of wire transfers for cash.

b.   Defendant HO would cause wire transfers to be sent to a bank account represented by a Cooperating Source ("CS1") to be CS1's own.

c.   In exchange for the funds wire transferred to this bank account, defendant HO would receive cash from CS1, who represented that the cash was the proceeds of specified unlawful activity.

d.   Defendant HO would pay CS1 a fee in return for converting into cash the amounts of the wire transfers conducted by defendant HO.

e.   Defendants LU and HUYNH would accept a fee from CS1 for facilitating the exchange of wired funds provided by defendant HO into cash provided by CS1.

C.   OVERT ACTS

4.   In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendants LU, HO, and HUYNH, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, Overt Acts numbered 155 through 200 as set forth in Count One, which are

1  re-alleged and incorporated by reference as if fully set forth

2  herein.

COUNT THIRTEEN

[18 U.S.C. §§ 1956(a)(3)(B), (C), 2(a), (b)]

On or about January 28, 2013, in Orange County, within the Central District of California, and elsewhere, defendants TU CHAU LU, also known as ("aka") "William Lu," aka "Bill Lu," aka "Bill," aka "Uncle Bill" ("LU"), BEN HO ("HO"), TOM HUYNH, aka "The Fat Guy" ("HUYNH"), while aiding and abetting each other, and together with others known and unknown to the Grand Jury, with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, that is, the felonious importation, receiving, buying, selling, and otherwise dealing in controlled substances punishable under a law of the United States ("drug trafficking"), and with the intent to avoid a transaction reporting requirement under State or Federal law, that is, through the filing of a materially false Currency Transaction Report, knowingly conducted, attempted to conduct, and caused to be conducted the following financial transaction, affecting interstate commerce, involving property represented by an authorized agent of the United States government to be proceeds of specified unlawful activity, that is, drug trafficking:

Transaction:  The exchange of two wire transfers, sent January 28, 2013, from the Rochester Enterprises account at Bank of America, to the Sunshine Enterprises account, in the amounts of $150,000 and $159,000, for $300,000 cash.

COUNT FOURTEEN

[18 U.S.C. §§ 1956(a)(3)(B), (C), 2(a), (b)]

On or about February 28, 2013, in Orange County, within the Central District of California, and elsewhere, defendants TU CHAU LU, also known as ("aka") "William Lu," aka "Bill Lu," aka "Bill," aka "Uncle Bill" ("LU"), BEN HO ("HO"), and TOM HUYNH, aka "The Fat Guy" ("HUYNH"), while aiding and abetting each other, and together with others known and unknown to the Grand Jury, with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, that is, the felonious importation, receiving, buying, selling, and otherwise dealing in controlled substances punishable under a law of the United States ("drug trafficking"), and with the intent to avoid a transaction reporting requirement under State or Federal law, that is, through the filing of a materially false Currency Transaction Report, knowingly conducted, attempted to conduct, and caused to be conducted the following financial transaction, affecting interstate commerce, involving property represented by an authorized agent of the United States government to be proceeds of specified unlawful activity, that is, drug trafficking:

Transaction:  The exchange of two wire transfers, sent February 28, 2013, from the Rochester Enterprises account at Bank of America, to the Sunshine Enterprises account, in the amounts of $150,000 and $150,000, for $300,000 cash.

COUNT FIFTEEN

[18 U.S.C. §§ 1956(a)(3)(B), (C), 2(a), (b)]

On or about March 28, 2013, in Orange County, within the Central District of California, and elsewhere, defendants TU CHAU LU, also known as ("aka") "William Lu," aka "Bill Lu," aka "Bill," aka "Uncle Bill" ("LU"), BEN HO ("HO"), and TOM HUYNH, aka "The Fat Guy" ("HUYNH"), while aiding and abetting each other, and together with others known and unknown to the Grand Jury, with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, that is, the felonious importation, receiving, buying, selling, and otherwise dealing in controlled substances punishable under a law of the United States ("drug trafficking"), and with the intent to avoid a transaction reporting requirement under State or Federal law, that is, through the filing of a materially false Currency Transaction Report, knowingly conducted, attempted to conduct, and caused to be conducted the following financial transaction, affecting interstate commerce, involving property represented by an authorized agent of the United States government to be proceeds of specified unlawful activity, that is, drug trafficking:

Transaction:  The exchange of one wire transfer, sent March 27, 2013, from the Rochester Enterprises account at Wells Fargo Bank, to the Sunshine Enterprises account, in the amount of $100,000, and two wire transfers, sent March 27, 2013, from the Rochester Enterprises account at Bank of America, to the Sunshine Enterprises account, in the amounts of $104,500 and $104,500, for $300,000 cash.

COUNT SIXTEEN

[18 U.S.C. §§ 1956(a)(3)(B), (C), 2(a), (b)]

On or about April 29, 2013, in Orange County, within the Central District of California, and elsewhere, defendants TU CHAU LU, also known as ("aka") "William Lu," aka "Bill Lu," aka "Bill," aka "Uncle Bill" ("LU"), BEN HO ("HO"), and TOM HUYNH, aka "The Fat Guy" ("HUYNH"), while aiding and abetting each other, and together with others known and unknown to the Grand Jury, with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, that is, the felonious importation, receiving, buying, selling, and otherwise dealing in controlled substances punishable under a law of the United States ("drug trafficking"), and with the intent to avoid a transaction reporting requirement under State or Federal law, that is, through the filing of a materially false Currency Transaction Report, knowingly conducted, attempted to conduct, and caused to be conducted the following financial transaction, affecting interstate commerce, involving property represented by an authorized agent of the United States government to be proceeds of specified unlawful activity, that is, drug trafficking:

Transaction:  The exchange of three wire transfers, sent April 26, 2013, from the Rochester Enterprises account at Bank of America, to the Sunshine Enterprises account, in the amounts of $60,500, $150,000, and $150,000, for $350,000 cash.

COUNT SEVENTEEN

[18 U.S.C. §§ 1956(a)(3)(B), (C), 2(a), (b)]

On or about May 30, 2013, in Orange County, within the Central District of California, and elsewhere, defendants TU CHAU LU, also known as ("aka") "William Lu," aka "Bill Lu," aka "Bill," aka "Uncle Bill" ("LU"), BEN HO ("HO"), TOM HUYNH, aka "The Fat Guy" ("HUYNH"), and LIEN TRAN ("TRAN"), while aiding and abetting each other, and together with others known and unknown to the Grand Jury, with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, that is, the felonious importation, receiving, buying, selling, and otherwise dealing in controlled substances punishable under a law of the United States ("drug trafficking"), and with the intent to avoid a transaction reporting requirement under State or Federal law, that is, through the filing of a materially false Currency Transaction Report, knowingly conducted, attempted to conduct, and caused to be conducted the following financial transaction, affecting interstate commerce, involving property represented by an authorized agent of the United States government to be proceeds of specified unlawful activity, that is, drug trafficking:

Transaction:  The exchange of two wire transfers, sent May 28, 2013, from the Rochester Enterprises account at Bank of America, to the Sunshine Enterprises account, in the amounts of $180,250 each, for $350,000 cash.

COUNT EIGHTEEN

[18 U.S.C. §§ 1956(a)(3)(B), (C), 2(a), (b)]

On or about June 27, 2013, in Orange County, within the Central District of California, and elsewhere, defendants TU CHAU LU, also known as ("aka") "William Lu," aka "Bill Lu," aka "Bill," aka "Uncle Bill" ("LU"), BEN HO ("HO"), and TOM HUYNH, aka "The Fat Guy" ("HUYNH"), while aiding and abetting each other, and together with others known and unknown to the Grand Jury, with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, that is, the felonious importation, receiving, buying, selling, and otherwise dealing in controlled substances punishable under a law of the United States ("drug trafficking"), and with the intent to avoid a transaction reporting requirement under State or Federal law, that is, through the filing of a materially false Currency Transaction Report, knowingly conducted, attempted to conduct, and caused to be conducted the following financial transaction, affecting interstate commerce, involving property represented by an authorized agent of the United States government to be proceeds of specified unlawful activity, that is, drug trafficking:

Transaction:  The exchange of two wire transfers, sent June 26, 2013, from the Rochester Enterprises account at Bank of America, to the Sunshine Enterprises account, in the amounts of $182,500 each, for $350,000 cash.

COUNT NINETEEN

[18 U.S.C. § 1956(h)]

1.    Paragraphs 1 through 10 of the General Allegations are re-
alleged and incorporated by reference as if fully set forth herein.

A.    OBJECTS OF THE CONSPIRACY

2.    Beginning on a date unknown and continuing until on or
about November 1, 2013, in Los Angeles and Orange Counties, within
the Central District of California, and elsewhere, defendants TU CHAU
LU, also known as ("aka") "William Lu," aka "Bill Lu," aka "Bill,"
aka "Uncle Bill" ("LU"), and RICHARD CHEUNG, aka "Richard Cheang"
("CHEUNG"), and others known and unknown to the Grand Jury, conspired
and agreed with each other to knowingly and intentionally commit the
following offenses:

a.    To knowingly conduct or attempt to conduct financial
transactions, affecting interstate and foreign commerce, believing
that the property involved in the financial transactions represented
the proceeds of some form of unlawful activity, and knowing that the
transactions were designed in whole or in part to conceal and
disguise the nature, the location, the source, the ownership, and the
control of the proceeds of specified unlawful activity, in violation
of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

b.    To knowingly conduct or attempt to conduct financial
transactions, affecting interstate and foreign commerce, believing
that the property involved in the financial transactions represented
the proceeds of some form of unlawful activity, and knowing that the
transactions were designed in whole or in part to avoid a transaction
reporting requirement under State or Federal law, in violation of
Title 18, United States Code, Section 1956(a)(1)(B)(ii).

88

1  B.    MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE

2        ACCOMPLISHED

3        3.    The objects of the conspiracy were to be accomplished, in

4  substance, as follows:

5             a.    Defendant LU would make arrangements to have defendant

6  CHEUNG receive cash from a Cooperating Source ("CS"), who represented

7  that the cash was the proceeds of specified unlawful activity, in

8  exchange for a wire transfer.

9             b.    Defendant CHEUNG would agree to pay CS1 a fee for

10 providing cash in exchange for the wire transfer.

11            c.    Defendant LU would receive a fee for assisting with

12 the money laundering transaction.

13 C.    OVERT ACTS

14       4.    In furtherance of the conspiracy and to accomplish the

15 objects of the conspiracy, defendants LU and CHEUNG, and others known

16 and unknown to the Grand Jury, committed various overt acts within

17 the Central District of California, and elsewhere, including, but not

18 limited to, Overt Acts numbered 201 through 210 as set forth in Count

19 One, which are re-alleged and incorporated by reference as if fully

20 set forth herein.

21

22

23

24

25

26

27

28

COUNT TWENTY

[18 U.S.C. § 1956(h)]

1.    Paragraphs 1 through 10 of the General Allegations are re-alleged and incorporated by reference as if fully set forth herein.

A.    OBJECTS OF THE CONSPIRACY

2.    Beginning on a date unknown and continuing until the date of this Indictment, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants TU CHAU LU, also known as ("aka") "William Lu," aka "Bill Lu," aka "Bill," aka "Uncle Bill" ("LU"), EDWARD KIM, aka "Eddie" ("KIM"), JOHN EDMUNDSON ("EDMUNDSON"), PABLO HERNANDEZ ("HERNANDEZ"), and EMILIO HERRERA ("HERRERA"), and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit the following offenses:

        a.    To knowingly conduct or attempt to conduct financial transactions, affecting interstate and foreign commerce, believing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

        b.    To knowingly conduct or attempt to conduct financial transactions, affecting interstate and foreign commerce, believing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole or in part to avoid a transaction

1   reporting requirement under State or Federal law, in violation of

2   Title 18, United States Code, Section 1956(a)(1)(B)(ii).

3   B.   <u>MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE</u>

4       <u>ACCOMPLISHED</u>

5      3.   The objects of the conspiracy were to be accomplished, in

6   substance, as follows:

7        a.   Defendant LU would make arrangements to have

8   defendants HERNANDEZ and HERRERA bring cash from Mexico to a

9   Cooperating Source ("CS").

10       b.   Defendant LU would arrange to have CS1, in exchange

11   for the cash the CS received, wire funds either to defendant

12   EDMUNDSON's bank account in Hong Kong, or back to bank accounts in

13   Mexico designated by defendants HERNANDEZ and HERRERA.

14       c.   Defendant LU would arrange to have defendants KIM and

15   EDMUNDSON negotiate the terms of the money laundering transactions

16   with defendants HERNANDEZ and HERRERA.

17       d.   Defendants HERNANDEZ and HERRERA would propose having

18   the cash to be provided to CS1 brought from Mexico using an armored

19   car service.

20       e.   Defendants HERNANDEZ and HERRERA would agree to buy a

21   controlling interest in Saigon National Bank to facilitate their

22   ability to conduct money laundering transactions.

23       f.   Defendants HERNANDEZ and HERRERA would pay CS1 a fee

24   for participating in the money laundering transactions.

25       g.   Defendant LU would accept a fee from CS1 for

26   facilitating the money laundering transactions.

27

28

C.   OVERT ACTS

4.   In furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendants LU, KIM, EDMUNDSON, HERNANDEZ and HERRERA, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, Overt Acts numbered 211 through 286 as set forth in Count One, which are re-alleged and incorporated by reference as if fully set forth herein.

COUNT TWENTY-ONE

[18 U.S.C. § 1512(b)(2)(B)]

On or about April 7, 2013, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendant EDWARD KIM, also known as "Eddie" ("KIM"), knowingly used intimidation and attempted to corruptly persuade another person, namely, an undercover agent ("UC2"), with the intent to cause and induce UC2 to alter, destroy, mutilate, and conceal objects, namely, emails, electronic messages, text messages, and other communications between defendant KIM and UC2, with the intent to impair the objects' integrity and availability for use in an official proceeding.

COUNT TWENTY-TWO

[31 U.S.C. §§ 5324(a)(2), (d)(2)]

On or about December 6, 2010, in Orange County, within the Central District of California, and elsewhere, defendants TU CHAU LU, also known as ("aka") "William Lu," aka "Bill Lu," aka "Bill," aka "Uncle Bill" ("LU"), TSUNG WEN HUNG, aka "Peter Hung," aka "Peter" ("HUNG"), and LUIS KRUEGER ("KRUEGER"), knowingly and for the purpose of evading the reporting requirements of Section 5313(a) of Title 31, United States Code, and the regulations promulgated thereunder, caused Saigon National Bank, a domestic financial institution, to file a currency transaction report as required by Title 31, United States Code, Section 5313(a), and the regulations promulgated thereunder, containing material omissions and misstatements of fact, upon receipt of the following currency transactions:

| Date Cash Received | Total Cash Amount Received | Date of Cashier's Checks | Amount of Cashier's Checks | Domestic Financial Institution |
|---|---|---|---|---|
| 12/6/10 | $200,000 | 12/6/10 | $100,000 cashier's check, number 02381, issued in the fictitious business name "United Business Associates" | Saigon National Bank |

| | | 12/6/10 | $100,000 cashier's check, number 02382, issued in the fictitious business name "United Business Associates" | Saigon National Bank |
| --- | --- | --- | --- | --- |
| Total Amount Structured: | | | $200,000 | |

All in violation of Title 31, United States Code, Sections 5324(a)(2) and 5324(d)(2), and Title 31, Code of Federal Regulations, Subtitle B, Chapter X, formerly cited as Title 31, Code of Federal Regulations, Part 103.

It is further alleged that defendants LU, HUNG, and KRUEGER committed this offense while violating other laws of the United States, namely, Title 18, United States Code, Sections 1962(d), 1956(h), and 1956(a)(3).

It is further alleged that defendants LU and HUNG committed this offense as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period.

COUNT TWENTY-THREE

[31 U.S.C. §§ 5324(a)(2), (d)(2)]

On or about January 24, 2011, in Orange County, within the Central District of California, and elsewhere, defendants TU CHAU LU, also known as ("aka") "William Lu," aka "Bill Lu," aka "Bill," aka "Uncle Bill" ("LU"), TSUNG WEN HUNG, aka "Peter Hung," aka "Peter" ("HUNG"), and DU TRUONG NGUYEN, aka "Andrew" ("D. NGUYEN"), knowingly and for the purpose of evading the reporting requirements of Section 5313(a) of Title 31, United States Code, and the regulations promulgated thereunder, caused Bank of America, a domestic financial institution, to file a currency transaction report as required by Title 31, United States Code, Section 5313(a), and the regulations promulgated thereunder, containing a material omission and misstatement of fact, upon receipt of the following currency transaction:

| Date Cash Received | Total Cash Amount Received | Date of Cashier's Check | Amount of Cashier's Checks | Domestic Financial Institution |
|---|---|---|---|---|
| 01/24/11 | $250,000 | 01/24/11 | $250,000 cashier's check issued in the fictitious business name "United Business Associates" | Bank of America |
| Total Amount Structured: | | | $250,000 | |

96

All in violation of Title 31, United States Code, Sections 5324(a)(2) and 5324(d)(2), and Title 31, Code of Federal Regulations, Subtitle B, Chapter X, formerly cited as Title 31, Code of Federal Regulations, Part 103.

It is further alleged that defendants LU, HUNG and D. NGUYEN committed this offense while violating other laws of the United States, namely, Title 18, United States Code, Section 1962(d), 1956(h), and 1956(a)(3).

It is further alleged that defendants LU and HUNG committed this offense as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period.

COUNT TWENTY-FOUR

[31 U.S.C. §§ 5324(a)(2), (d)(2)]

On or about March 14, 2011, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants TU CHAU LU, also known as ("aka") "William Lu," aka "Bill Lu," aka "Bill," aka "Uncle Bill" ("LU"), EDWARD KIM, aka "Eddie" ("KIM"), and MINA CHAU ("CHAU"), knowingly and for the purpose of evading the reporting requirements of Section 5313(a) of Title 31, United States Code, and the regulations promulgated thereunder, caused Wells Fargo Bank, a domestic financial institution, to file a currency transaction report as required by Title 31, United States Code, Section 5313(a), and the regulations promulgated thereunder, containing a material omission and misstatement of fact, upon receipt of the following currency transaction:

| Date Cash Received | Total Cash Amount Received | Date of Cashier's Check | Amount of Cashier's Check | Domestic Financial Institution |
|---|---|---|---|---|
| 03/14/11 | $350,000 | 03/14/11 | $350,000 cashier's check issued in the fictitious business name "United Business Associates" | Wells Fargo Bank |
| Total Amount Structured: | | | $350,000 | |

All in violation of Title 31, United States Code, Sections 5324(a)(2) and 5324(d)(2), and Title 31, Code of Federal Regulations, Subtitle B, Chapter X, formerly cited as Title 31, Code of Federal Regulations, Part 103.

It is further alleged that defendants LU, KIM, and CHAU committed this offense while violating other laws of the United States, namely, Title 18, United States Code, Sections 1962(d), 1956(h), and 1956(a)(3).

It is further alleged that defendants LU, KIM, and CHAU committed this offense as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period.

COUNTS TWENTY-FIVE AND TWENTY-SIX

[31 U.S.C. §§ 5324(a)(2), (d)(2)]

On or about June 20, 2011, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants TU CHAU LU, also known as ("aka") "William Lu," aka "Bill Lu," aka "Bill," aka "Uncle Bill" ("LU"), EDWARD KIM, aka "Eddie" ("KIM"), and MINA CHAU ("CHAU"), knowingly and for the purpose of evading the reporting requirements of Section 5313(a) of Title 31, United States Code, and the regulations promulgated thereunder, caused Chase Bank and Wells Fargo Bank, domestic financial institutions, to file currency transaction reports as required by Title 31, United States Code, Section 5313(a), and the regulations promulgated thereunder, containing material omissions and misstatements of fact, upon receipt of the following currency transactions:

| COUNT | Date Cash Received | Total Cash Amount Received | Date of Cashier's Check | Amount of Cashier's Check | Domestic Financial Institution |
|---|---|---|---|---|---|
| TWENTY-FIVE | 06/20/11 | $200,000 | 06/20/11 | $200,000 cashier's check, number 1144906932, issued in the fictitious business name "Dean Investment" | Chase Bank |

| TWENTY-SIX | 06/20/11 | $200,000 | 06/20/11 | $200,000 cashier's check, number 0014401593, issued in the fictitious business name "Dean Investment" | Wells Fargo Bank |
|---|---|---|---|---|---|
| Total Amount Structured: | | | | $400,000 | |

All in violation of Title 31, United States Code, Sections 5324(a)(2) and 5324(d)(2), and Title 31, Code of Federal Regulations, Subtitle B, Chapter X, formerly cited as Title 31, Code of Federal Regulations, Part 103.

It is further alleged that defendants LU, KIM, and CHAU committed these offenses while violating other laws of the United States, namely, Title 18, United States Code, Sections 1962(d), 1956(h), and 1956(a)(3).

It is further alleged that defendants LU, KIM, and CHAU committed these offenses as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period.

## COUNTS TWENTY-SEVEN AND TWENTY-EIGHT

### [31 U.S.C. §§ 5324(a)(2), (d)(2)]

On or about September 20, 2011, in Orange County, within the Central District of California, and elsewhere, defendants TU CHAU LU, also known as ("aka") "William Lu," aka "Bill Lu," aka "Bill," aka "Uncle Bill" ("LU"), EDWARD KIM, aka "Eddie" ("KIM"), and MINA CHAU ("CHAU"), knowingly and for the purpose of evading the reporting requirements of Section 5313(a) of Title 31, United States Code, and the regulations promulgated thereunder, caused Chase Bank and Wells Fargo Bank, domestic financial institutions, to file currency transaction reports as required by Title 31, United States Code, Section 5313(a), and the regulations promulgated thereunder, containing material omissions and misstatements of fact, upon receipt of the following currency transactions:

| COUNT | Date Cash Received | Total Cash Amount Received | Date of Cashier's Check | Amount of Cashier's Check | Domestic Financial Institution |
|---|---|---|---|---|---|
| TWENTY-SEVEN | 09/20/11 | $250,000 | 09/20/11 | $250,000 cashier's check, number 1144907755, issued in the fictitious business name "Executive Real Estate" | Chase Bank |

102

| TWENTY-EIGHT | 09/20/11 | $250,000 | 09/20/11 | $250,000 cashier's check, number 0014401607, issued in the fictitious business name "Executive Real Estate" | Wells Fargo Bank |
|---|---|---|---|---|---|
| Total Amount Structured: | | | | $500,000 | |

All in violation of Title 31, United States Code, Sections 5324(a)(2) and 5324(d)(2), and Title 31, Code of Federal Regulations, Subtitle B, Chapter X, formerly cited as Title 31, Code of Federal Regulations, Part 103.

It is further alleged that defendants LU, KIM, and CHAU committed these offenses while violating other laws of the United States, namely, Title 18, United States Code, Sections 1962(d), 1956(h), and 1956(a)(3).

It is further alleged that defendants LU, KIM, and CHAU committed these offenses as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 1963]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, in accordance with Title 18, United States Code, Section 1963, in the event of any defendant's conviction under Count One of this Indictment.

2.    In the event of a conviction under Count One, each defendant so convicted shall forfeit to the United States:

    a.    Any interest said defendant has acquired or maintained in violation of Title 18, United States Code, Section 1962;

    b.    Any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over any enterprise that said defendant has established, operated, controlled, conducted, or participated in the conduct of, in violation of Title 18, United States Code, Section 1962; and

    c.    Any property constituting or derived from, any proceeds that said defendant obtained, directly or indirectly, from racketeering activity, in violation of Title 18, United States Code, Section 1962.

3.    Pursuant to Title 18, United States Code, Section 1963(m), each defendant convicted under Count One of this Indictment shall forfeit substitute property, up to the value of the total amount described in paragraph 2, if, as the result of any act or omission of said defendant, the property described in paragraph 2, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially

diminished in value; or has been commingled with other property that cannot be divided without difficulty.

    4.    Each of the defendants convicted under Count One of this Indictment shall be jointly and severally liable for any forfeiture ordered as a result of such conviction.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982(a)(1)]

1.  Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, in accordance with Title 18, United States Code, Section 982(a)(1), in the event of any defendant's conviction under any of Counts Two through Twenty of this Indictment.

2.  Each defendant so convicted shall forfeit to the United States the following property:

        a.  all right, title, and interest in any and all property, real or personal, involved in any such offense, and any property traceable thereto; and/or

        b.  a sum of money equal to the total value of the property described in paragraph 2(a).

3.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), each defendant convicted under any of Counts Two through Twenty of this Indictment shall forfeit substitute property, up to the value of the total amount described in paragraph 2, if, as the result of any act or omission of said defendant, the property described in paragraph 2, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property that cannot be divided without difficulty.

4.    Each of the defendants convicted under any of Counts Two through Twenty of this Indictment shall be jointly and severally liable for any forfeiture ordered as a result of such conviction.

FORFEITURE ALLEGATION THREE

[31 U.S.C. § 5317(c)(1)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, in accordance with Title 31, United States Code, Section 5317(c)(1), in the event of any defendant's conviction under any of Counts Twenty-Two through Twenty-Eight of this Indictment.

2.    Each defendant so convicted shall forfeit to the United States the following property:

       a.    all right, title, and interest in any and all property, real or personal, involved in any such offense, and any property traceable thereto; and/or

       b.    a sum of money equal to the total value of the property described in paragraph 2(a).

3.    Pursuant to Title 31, United States Code, Section 853(p), as incorporated by Title 31, United States Code, Section 5317(c)(1)(B), each defendant convicted under any of Counts Twenty-Two through Twenty-Eight of this Indictment shall forfeit substitute property, up to the value of the total amount described in paragraph 2, if, as the result of any act or omission of said defendant, the property described in paragraph 2, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property that cannot be divided without difficulty.

1        Each of the defendants convicted under any of Counts Twenty-Two

2  through Twenty-Eight of this Indictment shall be jointly and

3  severally liable for any forfeiture ordered as a result of such

4  conviction.

5

6                            A TRUE BILL

7

8                         /S/

9                         Foreperson

10 EILEEN M. DECKER
   United States Attorney

11

12

13 LAWRENCE S. MIDDLETON
   Assistant United States Attorney

14 Chief, Criminal Division

15 ELIZABETH R. YANG
   Assistant United States Attorney

16 Chief, Violent and Organized
   Crime Section

17

18 KAREN I. MEYER
   Assistant United States Attorney

19 Violent and Organized Crime
   Section

20 ANDREW L. CREIGHTON
   Trial Attorney

21 Organized Crime & Gang Section
   Criminal Division

22

23

24

25

26

27

28